**LAW OFFICE OF BENJAMIN J. FUCHS**
Benjamin J. Fuchs (SBN 320793)
ben@bjflegal.com
2323 Broadway
Oakland, CA 94612
Tel: (510) 542-9201

**NIDEL & NACE, P.L.L.C.**
Chris Nidel (*Pro Hac Vice Forthcoming)*
chris@nidellaw.com
April Strauss (SBN 163327)
april@nidellaw.com
One Church Street, Suite 802
Rockville, MD 20850
Tel: (202) 780-5153

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MACY MERRELL, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FLORIDA CRYSTALS CORP. ~~and FANJUL CORP.~~,<br><br>Defendants. | Case No. 5:25-cv-02264-SVK<br><br>Hon. Susan van Keulen<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>1. Violation of False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*)<br>2. Violation of Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*)<br>3. Violation of Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)<br>4. Breach of Warranty<br>5. Unjust Enrichment<br><br>**JURY TRIAL DEMAND** |

Plaintiff Macy Merrell ("Plaintiff"), individually and on behalf of all others similarly situated, as more fully described below (the "Class" and "Class Members"), brings this class-action complaint against the Florida Crystals Corporation ("Florida Crystals" or "Defendant") ~~and the Fanjul Corporation (collectively, "Defendants")~~ and alleges the following based upon information and belief unless otherwise expressly stated as based upon personal knowledge.

## I. INTRODUCTION

1. Sugarcane growers have two options as they remove the extra leaves of their cane before harvesting: slashing ("green harvesting") or burning. Green harvesting requires an upfront investment in machinery but is cleaner for the environment. Burning is cheaper on the front end but comes with far greater costs to the environment—both locally and globally—and to the humans living nearby.

2. Due to the significant environmental harms associated with pre-harvest burning, three of the world's top five cane sugar producers—Brazil, India, and Thailand—have banned or severely restricted the practice. United States and China are the only holdouts among the top five. Still, environmentalists and other concerned citizens in the United States (and worldwide) continue to rally against burn harvesting because it is demonstrably worse for the environment than green harvesting.

3. Within the United States, Florida and Louisiana compete every year for the title of top-producing cane sugar state. No other state comes close.

4. And in Florida, Big Sugar—with unrivaled political influence and a statewide crop valued at close to $1 billion annually—is king.

5. Florida Crystals,~~, in partnership with parent company the Fanjul Corporation,~~ as~~is~~ one of the two Florida sugar giants that lead Big Sugar,~~. Florida Crystals~~ differentiates itself from competitors by marketing itself as the country's most environmentally conscious and climate-friendly sugar company~~—a strategic positioning that runs through its consumer sugar products~~.

6. Within this, Defendant relies heavily on prominent label claims promoting Florida Crystals' purported operation-wide environmental benefits to sell its consumer sugar products.

~~6.~~7. Specifically, Defendant ~~s~~ markets ~~label and advertise~~ the majority of its ~~Florida Crystals~~consumer sugar products using unsubstantiated front-label claims characterizing Florida Crystals as a company engaged in “Farming to Help Save the Planet,” with farms that “help fight climate change [and] build healthy soils.” Defendant~~s~~ bolsters these label claims with ~~similar~~ misrepresentations ~~on their sugar products’ packaging as well as~~ on consumer-targeted websites and social media that similarly~~,~~ tout~~ing~~ Florida Crystals’ supposed success in ~~commitment to~~ fighting climate change, among other claimed environmental benefits. ~~and protecting the environment through programs like regenerative farming and using barn owls to control rodent populations.~~

~~7.~~8. Through this aggressive marketing campaign, Defendant~~s~~ has~~ve~~ comprehensively branded Florida Crystals ~~and its~~ sugar products as *the* eco-friendly sugar option in the United States, intentionally appealing to the millions of American sugar consumers who seek to use their buying power to minimize environmental harm, including by slowing climate change.~~care about how their shopping habits impact the environment and climate change.~~

~~8.~~9. Consumers are being deceived. Defendant’s~~’~~ harmful practice of burning sugarcane before harvest does not “Help Save the Planet,” “help fight climate change,” or help “build healthy soils.” Instead, by choosing this method over available green methods like slashing, Defendant~~s~~ emits substantial volumes of unnecessary greenhouse gases that contribute to climate change as well as toxic particulate matter (PM2.5), dioxins, carbon monoxide, ammonia, elemental carbon, and volatile organic compounds that fill the air of the Florida Glades region on a daily basis during the six-to-eight-month harvesting season, poisoning local residents, who are disproportionately poor and people of color.

~~9.~~10. The drifting plumes of pre-harvest burns are so engrained in the everyday life of the Glades that locals have a name for the ash that falls on them, their homes, and their children: “black snow.”

~~10.~~11. Exposed to these emissions, which contain pollutants similar to those inhaled through smoking cigarettes, residents of the Glades region where Defendant~~s~~ burns the cane that

yields Florida Crystals products suffer significantly elevated rates of health conditions such as chronic asthma, chronic obstructive pulmonary disease, and cancer. Local healthcare providers can clock the onset of cane-burning season by the arrival of waves of patients with symptoms linked to smoke exposure. One recent study concluded that up to five deaths per year are at least partially attributable to this practice across the region.

12. Defendants harms the environment in other ways that render itstheir product claims false. For example, far from helping "build healthy soils," preharvest cane burning rather than slashing in fact *harms* rather than promotes soil health.

11.13. And as onesome of the largest agricultural landholders in the Everglades Agricultural Area ("EAA"), Defendants also further harms the environment through itstheir operations' impact on water quantity and quality in the region in two ways: first, Defendant's' release of fertilizer through the field runoff in Florida Crystals sugarcane farming operations contributes to "dead zones" in adjacent waterways, including Lake Okeechobee; second, Defendant's' outsized presence in the EAA significantly contributes to the EAA's blockage of southward water flow, starving the Everglades of clean water critical to the health of its ecosystems.

12.14. The experiences of those living in the affected Glades region—where one-third of residents live in poverty and the median household income of roughly $24,000 is half that of the statewide measure—stand in stark contrast to those of Defendant's' billionaire owners and their wealthy neighbors in eastern Palm Beach County, who in 1991 convinced the state government to ban cane-burning when the winds blow their direction. No such restriction protects the largely black and brown communities of the Glades.

13.15. This direct harm to Glades residents is clear—and Defendants hasand Big Sugar have taken great pains to avoid being held accountablereduce their liability for the harm they've caused in Florida, most notably by successfully advocating for an expanded "Right to Farm" law in 2021 that severely limited locals' rights to collectively seek justice in Florida state courts for personal injury.

14.16. While Defendants may presently have the "right" to continue choosing to burn, rather than slash, what itthey may *not* do under false advertising laws is continue to do so, unnecessarily poisoning people and the planet, while at the same time inducing reasonable consumers to believe that their purchases of Florida Crystals sugar supports a company whose farming on the whole *helps* fight climate change and otherwise *benefits* rather than harms the environment.falsely portraying themselves as responsible stewards of the planet and the environment prominently on the front label of their products.

17. Through false and deceptive marketing of its their sugar products, Defendants hasve violated multiple California consumer protection statutes as well as the common law.

18. Specifically, By by using unsubstantiated general environmental benefit claims to misleadlying to consumers about the true impacts of Florida Crystals' farming operations on the climate, soil, and environment,carbon footprint and its success in helping to "save the planet," Defendants hasve wrongfully induced Plaintiff Macy Merrell and other consumers to buy—or pay more for—itstheir green-packaged sugar products instead of competing sugar products that make no such greenwashing claims. either make no false greenwashing claims or in fact employ the available green harvesting method that environmentalists nationwide and Glades residents have been advocating for Big Sugar to embrace or years.

15.19. Defendants hasve therefore harmed——and continues to harm——American consumers as well as competing sugar purveyors, simultaneously undermining consumer choice and open competition in the free market.

16.20. Plaintiff, through this class action, seeks to (1) stop Defendants from continuing to deceive consumers and from unfairly seizing market share through itstheir deceptive marketing campaign, and (2) to secure refunds for the hundreds of thousands of consumers who have purchased Defendant's' sugar products at their premium prices based on Defendant's' false environmental claims.

17.21. **The Products** at issue are several varieties and sizes of sugar products sold under two lines of Defendant's' Florida Crystals brand: (1) Florida Crystals Regenerative Organic

Certified® Sugars and (2) Specialty Raw Cane Sugars.[1] These Products are sold both online and at leading brick-and-mortar stores throughout California and the broader United States.

~~18.~~22. Defendant~~s~~ has~~ve~~ used greenwashing to sell its~~their~~ Products for years. However, recognizing that consumers are increasingly concerned about climate change and protecting the environment—and that they carry those concerns into their shopping habits—Defendant~~s~~ implemented a redesign of its Product packaging in fall 2021,[2] replacing the old Product packaging's dominant light-green design and "Earth Friendly" greenwashing claim with a darker shade of green offset against lighter-green elements and carrying front-label claims misrepresenting Florida Crystals ~~the Products as derived from~~as a company defined through its "Farming to Help Save the Planet," ~~and~~ using "farms [that] help fight climate change & build healthy soil."[3]

~~19.~~23. Defendant's~~'~~ Product greenwashing claims of "Farming to Help Save the Planet" and "farms help fight climate change & build healthy soils," together with green-dominated packaging, (collectively, the "**Challenged Representations**") connote to consumers that their purchase of the~~the~~ Products will~~—and the methods through which Defendants produced them—~~ ~~are~~ benefits~~cial to~~ the Earth's natural environments, help combat climate change through a net

---

[1] The **Products** are: (1) Florida Crystals Regenerative Organic Raw Cane Sugar (in 2-pound bags, 3-pound jugs, 6-pound bags, 2- and 6-packs of 2-pound bags, 2-, 6-, 8-, and 10-packs of 3-pound jugs); (2) Florida Crystals Regenerative Organic Light Brown Sugar (in 1.5-pound bags and 2- packs of 1.5-pound bags); (3) Florida Crystals Regenerative Organic Powdered Sugar (in 1.5- pound bags and 2- and 6-packs of 1-pound bags); (4) Florida Crystals Organic Cane Sugar (in 2-packs of 3-pound jugs); (5) Florida Crystals Turbinado Cane Sugar (in 2-pound bags, 44-ounce jugs, 5-pound bags, and 2-packs of 3-pound jugs); (6) Florida Crystals Raw Cane Sugar (in 2-pound bags, 3-pound jugs, and 2-pack of 3-pound jugs); (7) Baker's Collection of Regenerative Organic Sugars (three-packs containing one 32-ounce bag of Florida Crystals Regenerative Organic Raw Cane Sugar, one 24-ounce bag of Florida Crystals Regenerative Organic Light Brown Sugar, and one 16-ounce bag of Florida Crystals Regenerative Organic Powdered Sugar); and (8) Florida Crystals Regenerative Organic Powdered Sugar (2-packs of 16-ounce bags).

[2] *Florida Crystals Consumer Brand Gets Award-Winning New Look!*, FLORIDA CRYSTALS CORP., https://www.floridacrystalscorp.com/news/Florida-Crystals-Consumer-Brand-Gets-New-Look (last visited Feb. 24, 2025) (reflecting 2021 redesign announcement).

[3] Defendant~~s~~ announced another label redesign in November 2024 to emphasize Florida Crystals' status as a Regenerative Organic Certified sugarcane producer on certain product packaging. *See* Joanna Cosgrove, *A Bold Paper Packaging Refresh for Florida Crystals' Sugars*, PACKAGING DIGEST (Nov. 26, 2024), https://www.packagingdigest.com/food-packaging/florida-crystals-sugar-packages-get-a-colorful-refresh. Defendant's~~'~~ announcement of the label changes focused on 50-pound bags of sugar products not regularly sold to non-commercial consumers via brick-and-mortar supermarket chains. The new packaging will also retain the false front-label claim of "Farming to Help Save the Planet."

reduction in the greenhouse gases that cause climate change, and build healthy soils. Representative images of Defendant's Products are shown below.[4]




[4] The Product images were taken from Florida Crystals' official website, https://www.floridacrystals.com/products (last visited Feb. 27, 2025).


FLORIDA CRYSTALS®
SWEETNESS you can FEEL GOOD about
As farmers of Regenerative Organic Certified® land, we lead the fight for a cleaner, greener future.
Why Regenerative Agriculture?
GOOD FOR THE SOIL & THE AIR
Carbon belongs in the soil – not the air we breathe. Regenerative farming pulls carbon from the air and stores it in the soil ( climate change, soil).
GOOD FOR BIODIVERSITY
We build local habitats for pollinators ( ) and birds (like and ) to protect your foods - day and night.
GOOD FOR TASTY FOOD
Healthier soil. Happier plants. Now, that's sweet ( ).
NUTRITION FACTS
About 85 servings per container
Serving size 2 tsp (8g)
Amount per serving
Calories 30
% Daily Value*
Total Fat 0g 0%
Sodium 0mg 0%
Total Carbohydrate 8g 3%
Total Sugars 8g
Includes 8g Added Sugars 16%
Protein 0g
* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.
INGREDIENTS: Organic Raw Cane Sugar, Organic Molasses.
Distributed by Domino Foods, Inc., West Palm Beach, FL 33401
FOLLOW US ON SOCIAL MEDIA: @floridacrystalssugar @floridacrystals
FOR RECIPES
Find out more at floridacrystals.com
0 75779 31118 3


FARMING to HELP
SAVE the PLANET
GROWN IN THE U.S.
SINCE 1960
FLORIDA
CRYSTALS
REGENERATIVE
ORGANIC
Raw Cane Sugar
USDA ORGANIC
NON GMO Project VERIFIED
BRONZE
Regenerative Organic Certified
NET WT. 48 oz (3 lb) | 1.36 kg
CONTENTS MAY SETTLE


FLORIDA CRYSTALS®
SWEETNESS you can FEEL GOOD about
We lead the fight for a cleaner, greener future from (below) the ground up.
That's why we farm
REGENERATIVE ORGANIC.
We are passionate about healthier soil, more biodiversity, less waste and (of course) tasty food.
NUTRITION FACTS
About 170 servings per container
Serving size 2 tsp (8g)
Calories 30
Total Fat 0g 0%
Sodium 0mg 0%
Total Carbohydrate 8g 3%
Total Sugars 8g
16%
Protein 0g
INGREDIENT:
Organic Raw Cane Sugar.
FOLLOW US ON SOCIAL MEDIA:
@floridacrystalssugar
@floridacrystals
Distributed by Domino Foods, Inc., West Palm Beach, FL 33401
FOR RECIPES
Find out more at floridacrystals.com
USDA ORGANIC
NON GMO VERIFIED
Regenerative Organic Certified
BRONZE
PLASTIC JUG
0 75779 31110 7

24. Defendants further reinforces itstheir prominent front-label Product label claims through similar representations throughout the Products' packaging as well as on itsDefendants' website and social media channels—all of which likewise strive to sell the Products using general environmental claims referencing Florida Crystals' *companywide practices and attributes* rather characteristics that apply to certain Products but not to others. For example, Defendants promotes on itstheir Product packaging that purchasing the Products is "Sweetness You Can Feel Good About," that Florida Crystals "leads the fight for a cleaner, greener future from (below) the ground up," and that Florida Crystals is "passionate about healthier soil, [and] more biodiversity."

25. Additionally, Defendants hasve chosen to dedicate the very first space visitors see on Florida Crystals' website homepage—which uses the same green-centric design as the Product labels—to remind consumers that Florida Crystals is engaged in "Farming to Help Save the Planet," and that the company "is the first and only grower of [Regenerative Organic Certified] sugarcane in the U.S., cultivating a thriving planet for generations to come"—a placement decision affirming that Defendants strategically prioritizes the Products' supposed environmental friendliness over their taste, uses, *or any other quality*.[5]

20.26. And Defendants doubles down on this false messaging through itstheir social media channels, proclaiming, for example, that Florida Crystals sugars "are produced with practices that actually help reduce carbon in the air," informing prospective consumers that they "can make a difference" and "a positive impact" "with Florida Crystals"[6] because the Products are "not just sugar," but "a conscious choice"[7] is "kind to you, the planet, and your wallet,"[8] and through which consumers are "helping create a better future."[9] Defendant's' greenwashing campaign—from

[5] FLORIDA CRYSTALS, https://www.floridacrystals.com/ (last visited Feb. 27, 2025).
[6] Florida Crystals®, *Learn about Florida Crystals® Regenerative Certified Sugars!®*, YOUTUBE (Aug. 29, 2024), https://www.youtube.com/shorts/b1yEHESrNqM; *see also* @floridacrystalssugar, INSTAGRAM, https://www.instagram.com/floridacrystalssugar/ (Defendants repeating the tagline "Farming to Help Save the Planet" on Florida Crystals' consumer-facing Instagram account) (last visited Feb. 27, 2025).
[7] Florida Crystals®, *We've got some sweet news to share.*, YOUTUBE (Mar. 28, 2024), https://www.youtube.com/shorts/fuZWyO5cEU4.
[8] Florida Crystals®, *Homegrown Sweetness | Florida Crystals®*, YOUTUBE (Oct. 3, 2022), https://www.youtube.com/watch?v=HWcXovhLxL0.
[9] Florida Crystals®, *Florida Crystals® | Regenerative Organic Certified®*, YOUTUBE (Aug. 28, 2024), https://www.youtube.com/watch?v=aQUTrTzMVSo.

design to verbiage—is comprehensive, consistent, and robust in its reinforcement of the false front-label claims in question and, ensuring consumers are misled while proving that Defendants recognizes the persuasive power of these claims—apparently above all other Product attributes.

21.27. Yet each of these claims is false. Defendant's' choice to systemically conduct pre-harvest cane burns releases far more greenhouse gases than does pre-harvest slashing while also damaging soil as compared to slashing. And Defendants, through both itstheir pre-harvest burns on the vast majority of its South Florida cane fields and and its operation-wide impact on localSouth Florida water systems, harms—rather than saves—the planet.

22.28. Reasonable consumers considering their food options want to know whether their purchase of a products promoted primarily for itstheir claimedpurported environmental benefits (or, at minimum, including a reductionlack of environmental harm) will actually deliver those benefitstruly possess these qualities. This information is critical to making informed purchasing decisions, especially as the impacts of climate change become more acute and unavoidable, and consumers become increasingly conscious and cognizant of their own abilities to impact climate change through their consumption choices.

23.29. Defendants hasve capitalized on the growing demand for products that consumers believe help—or do not worsen—climate change as well as localized environmental harm by building the entire Florida Crystals brand identity around its claimed environmentalism, doubling down twice in the last four years with label redesigns accompanied by press releases that falsely position Florida Crystals sugar products as a vehicle for environmentally conscious consumers to support a company that fights climate change (by ensuring a net-neutral or better greenhouse gas footprint) and otherwise cares for the natural planet. Through this deception, Defendants undermines consumer trust, impedes informed purchase decisions, and puts health at risk—all the while inducing responsible consumers to pay money to support the very harms they reasonably believe they're combatting.

24.30. Defendants hasve at all relevant times had full knowledge of the true Products' environmental impacts of its farming operations, as Defendants designed, manufactured, promoted,

distributed, and sold the Products through practices that harmed the environment (and rendered the label claims false) rather than taking appropriate measures to eliminate such harms (and to thus render the label claims true). Environmentalists and Glades residents have also reiterated to Defendant~~s~~ for years in no uncertain terms the environmental harm Defendant's~~'~~ practices cause, including through organizing campaigns,[10] class-action lawsuits,[11] and federal civil rights complaints[12]. In response, however, Defendant~~s~~ has~~ve~~ continued to affirmatively choose to continue burn methods that poison people and the planet rather than employ available slashing methods, while falsely promising environmental stewardship to consumers nationwide.

~~25.~~31. Through falsely, misleadingly, and deceptively labeling, advertising, and marketing the Products, Defendant~~s~~ has~~ve~~ sought to take advantage of unwitting consumers as well as Defendant's~~'~~ lawfully acting competitors, over whom Defendant~~s~~ maintains an unfair competitive advantage by wrongfully cornering the growing market of climate- and environmentally conscious sugar consumers.

~~26.~~32. **Primary Dual Objectives.** Plaintiff brings this action individually and in a representative capacity on behalf of those similarly situated consumers who purchased the Products during the relevant Class Period (Class and/or Subclass defined *infra*) for dual primary objectives. ***One***, Plaintiff seeks on behalf of herself and the proposed Class a monetary recovery of the price premium Plaintiff and consumers have overpaid for Products that should, but fail to, comport with the Challenged Representations, as consistent with permissible law (including, for example,

---

[10] *See, e.g.*, Michelle Mairena and Kyndall Hubbard, *Sugarcane Burning Is a Plague on These Black Floridians*, MOTHER JONES (Oct. 23, 2023), https://www.motherjones.com/politics/2023/10/sugarcane-burning-florida-everglades-environmental-justice/; *see also* Luz Torres, *Another sugar cane harvest season and my community continues to get burned | Opinion*, PALM BEACH POST (Nov. 22, 2024), https://www.palmbeachpost.com/story/opinion/columns/2024/11/22/opinion-stop-choking-our-children-with-sugar-cane-smoke/76429184007/.

[11] *See, e.g.*, Tyler Treadway, *Amended lawsuit filed claiming pollution, health problems from sugar cane field burning*, FLORIDA TIMES-UNION (June 24, 2020), https://www.jacksonville.com/story/news/2020/06/24/amended-lawsuit-lawsuit-filed-claiming-pollution-health-problems-from-sugar-cane-field-burning/41746649/ (covering developments in *Coffie v. Fla. Crystals Corp.*, No. 19-80730 (S.D. Fla. June 4, 2019)).

[12] Joya Manjur & Karimah Schoenhut, *Request for Investigation Under Title VI of the Civil Rights Act of Florida Forest Service Sugarcane Field Burn Authorization Practices*, SIERRA CLUB (Aug. 25, 2023), https://www.sierraclub.org/sites/default/files/2023-08/FINAL%20Title%20VI%20Letter%20to%20EPA%20and%20USDA_8.25.23.pdf.

damages, restitution, disgorgement, and any applicable penalties/punitive damages solely as to those causes of action so permitted). ***Two***, Plaintiff seeks on behalf of herself and the proposed Class injunctive relief to stop Defendant's' unlawful design, manufacture, marketing, and sale of the Products with the Challenged Representations to eliminate or mitigate the future risk of deceiving the public into believing that purchase of the Products benefitsare beneficial to the Earth and its natural environments, including by combatting climate change and building healthy soils,, as well as to the Glades' soils in which the Products' cane is grown, by requiring Defendants to change itstheir business practices, which may include one or more of the following: immediate removal or modification of the Challenged Representations from the Products' labels; and/or discontinuance of the Products' manufacture, marketing, and/or sale.

## II. JURISDICTION

27.33. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Section 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over this action's state law claims pursuant to 28 U.S.C. Section 1367.

## III. VENUE

28.34. Venue is proper in this District under 28 U.S.C. Section 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Specifically, as detailed below, Plaintiff purchased the unlawful Products in this District, and Defendants hassve marketed, advertised, and sold the Products within this District (and continues to do so).

## IV. PARTIES

### A. Plaintiff

29.35. **Plaintiff Macy Merrell.** The following is alleged based upon Plaintiff Macy Merrell's personal knowledge:

a. **Residence.** Plaintiff Merrell is a citizen of California who is domiciled in Santa Cruz, California.

b. **Purchase Details.** Plaintiff Merrell purchased the Florida Crystals Regenerative Organic Raw Cane Sugar Product (two-pound bag size) (the “Purchased Products”) for approximately $5.99 from a Safeway store in Santa Cruz, California on several occasions between approximately September 2021 and August 2024.

c. **Reliance on Challenged Representations**. In making her purchases, Plaintiff Merrell read the “Farming to Help Save the Planet” and “our farms help fight climate change & build healthy soil” representations on the Products’ label, leading Plaintiff Merrell to believe that Florida Crystals’ farms help save the planet, fight climate change, and build healthy soil—and that purchasing the Products over competing sugar products would further these efforts and outcomes~~the farming and manufacture of the Products was helping rather than harming the planet~~.

d. **No Actual Knowledge of Falsity.** At the time of her purchases, Plaintiff Merrell did not know that the “Farming to Help Save the Planet” and “our farms help fight climate change & build healthy soil” representations were false because she did not know that Defendant~~s~~ through its farming operations engaged in pre-harvest cane-burning and contributed to South Florida’s water issues.

e. **No Notice of Contradictions.** Plaintiff Merrell did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products’ label that contradicted the prominent Challenged Representations or otherwise suggested that purchasing the Products would *not* in fact support farming practices that on a companywide basis help fight climate change, help build healthy soil, or help save the planet.~~in fact *harmed* the planet and soil and *contributed to* (rather than fought) climate change.~~

f. **Causation/Damages.** Plaintiff Merrell would not have purchased the Products or would not have paid as much for the Products but for the Challenged

Representations—i.e., that their purchase supported a company dedicated tothe Products came from "Farming to Help Save the Planet" and whoseand that Defendants' "farms help fight climate change & build healthy soil."

g. **Desire to Repurchase.** Plaintiff Merrell continues to see the Products available for purchase, continues to desire to buypurchase sugar products whose purchase isthat are truly beneficial to the environment and, soil, and the fight against and that enable consumers to support companies that fight climate change, and thus would consider purchasing the Products again in the future if she could be sure the Products delivered their advertised benefits.

h. **Lack of Personal Knowledge/Expertise to Determine Truth.** Plaintiff Merrell is not personally familiar with the formulation of the Products, as she does not possess any specialized knowledge, skill, experience, or education in cane-sugar harvesting or production. Thus, Plaintiff Merrell is unable to determine through Defendant's' packaging whether the Products' Challenged Representations are true.

30.36. **Plaintiff's Future Harm.** Defendants continues to label and sell the Products with the Challenged Representations. However, Plaintiff is an average consumer who is not sophisticated in cane-sugar farming, harvesting, and production—nor does she have the ability to analyze the environmental impacts of Florida Crystals' on-the-ground farming operations going forward as they relate to the Challenged Representations. Since Plaintiff would like to purchase the Products again—despite that the Products were once marred by false advertising or warranties—yet has no way to determine whether Defendant's label claims are in fact true by merely viewing the Products' labels, Plaintiff would likely and reasonably—, but incorrectly—, assume that purchasing the Products benefitsare beneficial to the Earth and its environments, helps as well asbuild healthy agricultural soil, and that their production helps fight climate change by supporting Florida Crystals' farming operations writ large. Accordingly, Plaintiff is at risk of reasonably, but incorrectly, assuming that Defendants has taken appropriate measures to render the Challenged Representations truehave fixed the Products and the processes by which they are produced such

that Plaintiff may buy the Productsthem again, believing they are no longer falsely advertised and warranted. In this regard, Plaintiff is currently and, in the future, deprived of the ability to purchase the Products.

**B. Defendants**

31.37. **Defendant Florida Crystals** is a Delaware-registered corporation with a principal place of business in West Palm Beach, Florida. Florida Crystals is a subsidiary of Defendant Fanjul Corporation.[13] In addition to manufacturing, marketing, and selling cane sugar and other products, Florida Crystals on information and belief owns or co-owns other companies, including ASR Group (f/k/a American Sugar Refining, Inc.).

32. **Defendant Fanjul Corporation** is a Florida-registered corporation with a principal place of business in West Palm Beach, Florida. The Fanjul Corporation is the parent company of Florida Crystals.

33.38. Both Defendants wasere doing business in the state of California at all relevant times. Directly and through itstheir agents, Defendants hasve substantial contacts with and receives substantial benefits and income from and through the state of California.

34.39. Defendant iss are the owners, manufacturers, and/or distributors of the Products. Defendants and itstheir agents promoted, marketed, and sold the Products at issue throughout the United States, including, in particular, within the state of California.[14] The unfair, unlawful, deceptive, and misleading Challenged Representations on the Products were prepared, authorized, ratified, and/or approved by Defendants and itstheir agents to deceive and mislead consumers within the state of California into purchasing the Products. Defendants issued the Challenged Representations despite knowing full well that the Products—which they designed, manufactured, marketed, and sold[15]—and Florida Crystals' operation-wide farming methods the methods of their

[13] Susan Salisbury, *With acquisition of Tate & Lyle, Palm Beach County-owned sugar giant goes global*, PALM BEACH POST (Apr. 1, 2012), https://www.palmbeachpost.com/story/business/2010/07/01/with-acquisition-tate-lyle-palm/7597397007/.

[14] Defendants sell their Products throughout California and the nation through third-party retailers as well as directly through Florida Crystals' official Amazon.com store page.

[15] Defendants sell their Products throughout California and the nation through third-party retailers as well as directly through Florida Crystals' official Amazon.com store page.

creation do *not* fight climate change, do *not* holistically benefit the Earth, and do *not* help create healthy soils due to both the predominance of Defendant's use of burn-harvesting across its EAA farms and the water impacts of these farms. Further, Defendants at all relevant times had the right and authority to discontinue use of the Challenged Representations, including the time leading up to and through the incidents giving rise to the claims asserted herein (including Plaintiff's Product purchases described *supra* as well as all Class Members' purchases of the Products).

## V. ALTER EGO

35. On information and belief, in addition to their respective direct liability for the unlawful acts alleged herein, Defendants are liable under an alter-ego theory.

36. Defendants share a principal place of business at 1 North Clematis Street in West Palm Beach, Florida.

37. Defendants also share common corporate officers and management. Defendants' common management include co-chairmen and co-chief executive officers in Alfonso "Alfy" Fanjul and Jose "Pepe" Fanjul, Sr.; co-presidents in Jose Fanjul, Jr. and Luis J. Fernandez; vice presidents in Erik Blomqvist, Alejandro Londono, and Parks D. Shackelford; a senior vice president (president - Okeelanta Division) in Andres Fanjul; a senior vice president (president - Osceola Division) in Alexander Fanjul; a vice president and chief accounting officer in Mehdi Hendi; a vice president (Risk Management) in Arlene Lasagna; assistant vice presidents (Tax) in Nick Jacobs and Brian D. Rice; a secretary in Armando Tabernilla; an assistant secretary in Benjamin Sadler; and additional directors in Lillian Fanjul and David C. Patterson.

38. Through this shared leadership, management, and physical nerve center adjacent to the EAA, Defendant Fanjul Corporation exercised and continues to exercise complete domination and control over its subsidiary Florida Crystals. That is, Florida Crystals has not and does not operate independently of Fanjul Corporation, nor are transactions between Defendants conducted at arm's length. Rather, Fanjul Corporation dictates every meaningful facet of Florida Crystals' business, including contributing to broad policy decisions and day-to-day management of Florida Crystals' sugar production operations.

~~39. In light of this unity of interest, failing to disregard the purported separate identities of Defendants as to either jurisdiction or liability would thus result in fraud or injustice by permitting Fanjul Corporation to avoid scrutiny for attributable actions.~~

## VI. FACTUAL ALLEGATIONS

### A. In a Region Marked by Environmental Injustice, Defendants Continues to Prioritize Profit Over People and the Planet by Engaging in Harmful Pre-Harvest Sugarcane Burns

40. Florida Crystals, a major holding in the billionaire Fanjul family's multinational sugar empire, occupies close to half of all acreage in the Everglades Agricultural Area, a sprawling checkerboard of farmland built on what used to be the northern third of the Everglades just south of Lake Okeechobee.

41. The Glades—the region in western Palm Beach County in which the EAA is located—is famous for its sugar, with cane fields covering more than 400,000 acres typically accounting for more than half the nation's annual cane sugar production. But the Glades is also infamous for deep-seated impoverishment and institutional neglect[16]—a place that in the 1980s was "so racked by poverty and AIDS that foreign service trainees were sent there to prepare for the Third World."[17]

42. These dual realities remain in place generally today and are exemplified by the State's disparate approach to similar campaigns to regulate cane pre-harvest burning by two very dissimilar Palm Beach County constituencies.

43. In 1991, after wealthy communities in eastern Palm Beach County complained about cane smoke drifting eastward from the Glades, the state Department of Agriculture acted quickly to ban cane burning—*but only when the wind was blowing east*. The much poorer, less-white towns of the

---

[16] *Economics*, STOP SUGAR BURNING, https://stopsugarburning.org/the-burning-problem/#economics (reflecting that as of 2020, Belle Glade was ranked Florida's poorest overall city, with Pahokee ranked second, and South Bay among the top 10 based on statewide poverty, median household income, and unemployment rate metrics) (last accessed Feb. 27, 2025).

[17] Lulu Ramadan et al., *The Smoke Comes Every Year. Sugar Companies Say the Air Is Safe*, PROPUBLICA (July 8, 2021), https://projects.propublica.org/black-snow/.

Glades received no such protection despite their closer proximity to the fires and the risks they presented.

44. Fast-forward three decades: Florida Crystals and other Florida sugar manufacturers were facing a major proposed class action alleging nuisance, trespass, strict liability for ultrahazardous activities, and related causes of action for exposing Glades residents to the hazardous emissions of burn-harvesting. *Coffie v. Fla. Crystals Corp*., No. 19-80730 (S.D. Fla. June 4, 2019). Big Sugar in turn flooded the Florida Legislature and executive offices with lobbyists. From 2018 to 2021, Florida Crystals alone spent more on lobbying than any company other than U.S. Sugar Corporation—the second head of Florida's sugar lobby. In early 2021, these investments paid dividends as Florida's governor signed into law an expanded Florida Right to Farm Act that severely restricted the ability of Glades residents from collectively suing polluters for exposing them to hazardous pollutants through the airborne emissions released through burn harvesting.[18] The State's seemingly disparate approach to very similar complaints over cane-burning permitting—acting speedily to proactively protect one group while blocking the other from even *seeking* justice—has provoked federal civil rights complaints alleging systemic racism.[19]

45. Yet despite years of public scrutiny of the issue, the Fanjuls' vast wealth, and the known ways in which agricultural burning contributes to climate change by releasing intense plumes of greenhouse gases, harms the local environment, and sickens and even kills those living nearby, Defendants continues to choose to burn off the leafy matter from its EAAtheir Florida Crystals cane crops through controlled burns rather than slashing[20]—all while gaslighting consumers into

---

[18] Lulu Ramadan & The Palm Beach Post, *"They're Trying to Make It So We Walk Away": It's About to Get Harder to File Lawsuits Saying Sugar Harvesters Poisoned the Air*, PROPUBLICA (Apr. 28, 2021), https://www.propublica.org/article/florida-sugar-cane-legislation; *see also* Grace Coleman, *Not So Sweet: Sugarcane Burning, Florida's Right-to-Farm Act, and Unconstitutional Takings*, COLUMBIA HUMAN RIGHTS L. REV. (Dec. 5, 2022) https://hrlr.law.columbia.edu/hrlr-online/not-so-sweet-sugarcane-burning-floridas-right-to-farm-act-and-unconstitutional-takings/ (noting that "[w]hile every state has a right-to-farm law, Florida's is uniquely strong because it bars all claims against farmers by landowners arising in "nuisance, negligence, trespass, personal injury, strict liability, or other tort," so long as that claim arises from "interference with reasonable use and enjoyment of land, including, but not limited to, noise, smoke, odors, dust, fumes, particle emissions, or vibration"" —essentially empowering "agricultural operators" to "harm their neighbors' property and health with impunity") (citing Fla. Stat. § 823.14(3)(f) (2022))).

[19] Joya Manjur & Karimah Schoenhut, *supra* n. 12.

[20] Defendants claims it that they do does not conduct pre-harvest burns on itstheir EAA organic cane fields. However, even if this were true, these fields account for only approximately 10,000 acres of Florida Crystals' 190,000-acre

thinking purchasing Florida Crystals sugar Products benefits the environment and helps fight climate change when in fact itthey do does the opposite.

### *1. Defendant's' Pre-Harvest Burns Contribute to Rather than "Fight" Climate Change*

46. Sugarcane pre-harvest burning is notoriously dirty. During these burns, farm workers intentionally alight cane fields to strip the stalks of leaf detritus before the cane is chopped down, collected, and transported for further processing into various consumer products.

47. These burns are short—lasting only 15 to 40 minutes, on average—but intense, releasing towering ash plumes containing greenhouse gases such as carbon dioxide, methane, and nitrogen oxide, volatile organic compounds (which can contribute to climate change by altering concentrations of ozone, itself a powerful greenhouse gas[21]), and toxic gaseous compounds and chemicals like polycyclic aromatic hydrocarbons, carbon monoxide, and particulate matter, including the notoriously pernicious fine particulate matter called PM2.5.[22]

48. Recognizing the threats these emissions pose to air quality, the environment, and human health, governments around the world have aggressively restricted or banned sugar pre- harvest burning to reduce emissions of methane and other powerful greenhouse gases and other air pollutants acted stridently to reduce pre-harvest burns. These include the world's top three sugar

EAA sugarcane operations—i.e., just over 5 percent of Defendants' Florida Crystals EAA cane fields. *See* FLORIDA CRYSTALS, https://www.floridacrystalscorp.com/Florida_Crystals_Organic_Sugar_Molasses_and_Rice_Earn_Distinctive_Regenerative_Organic_Certified_Status (last visited June 8, 2025); *see* also FLORIDA CRYSTALS, https://www.floridacrystalscorp.com/ (last visited June 8, 2025). Furthermore, Defendants on information and belief does not source all of the sugar sold to consumers in the United States as Regenerative Organic Certified Products from Defendants's EAA organic fields. ~~Defendants have made no such claims of green-harvesting as to the sugar they source from outside the EAA and sell to consumers within the United States as Florida Crystals Regenerative Organic Certified Products.~~

[21] Elena David & Violeta-Carolina Niculescu, *Volatile Organic Compounds (VOCs) as Environmental Pollutants: Occurrence and Mitigation Using Nanomaterials*, 18 INT. J. ENV'T. RES. PUBLIC HEALTH 13147 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8700805/.

[22] Lulu Ramadan et al., *supra* n. 16; *see also* Violeta Mugica-Alvarez et al., *Sugarcane Burning Emissions: Characterization and Emission Factors*, 193 ATMOSPHERIC ENV'T 262-72 (2018), https://www.sciencedirect.com/science/article/abs/pii/S1352231018305995.

producing nations: Brazil,[23] India,[24] and Thailand[25]. Yet the United States—the fourth-leading sugar producer—has not specifically addressed the issue, effectively leaving burn-specific regulation to the states.[26]

49. And even within the United States' laissez-faire approach, Florida is unique in its unwillingness to confront pre-harvest burns (absent noted exception when prevailing winds threaten to push burn plumes toward West Palm Beach—incidentally, headquarters of both Defendants and the hub of the Fanjul family empire): Even the State of Louisiana—Florida's arch-rival for domestic sugar production supremacy, and itself not known for an embrace of environmental regulation—was moved in the mid-1990s to pressure its cane-growers to switch from burning to cutting to reduce emissions.[27]

50. Defendants, by exploiting Florida's permissive approach to pre-harvest burning—an approach Defendants and the rest of Big Sugar seek to preserve through their sizeable annual investments in statehouse political lobbying—adds a substantial net volume of climate-destabilizing greenhouse gases to the atmosphere. Researchers have found that switching from burning to green harvesting—i.e., slashing—reduces greenhouse gas emissions during the harvest period by approximately 24 percent.[28] And even factoring in year-round emissions (produced by all facets of crop growth, maintenance, and harvesting) *and* assuming the machinery involved in

---

[23] Brazil's São Paulo state, which produces more than half of the country's sugarcane, has been phasing out cane-burning for more than two decades under litigation passed in 2002 establishing a gradual phase-out of the practice by 2031. Fernanda Valente & Márcio Poletti Laurini, *Pre-Harvest Sugarcane Burning: A Statistical Analysis of the Environmental Impacts of a Regulatory Change in the Energy Sector*, 4 CLEANER ENGINEERING AND TECHNOLOGY 100255 (2021), https://www.sciencedirect.com/science/article/pii/S2666790821002159.

[24] India has banned and criminalized agricultural burning. *See* Ramadan et al., *supra* n. 16.

[25] Thailand has been pressuring sugarcane farmers and sugar manufacturers to switch from burning to green harvesting through a combination of financial incentives and penalties under air pollution policies enacted in 2019. *See* Wirawat Chaya, *Reframing the Wicked Problem of Pre-Harvest Burning: A Case Study of Thailand's Sugarcane*, 10 HELIYON e29327 (2024), https://pubmed.ncbi.nlm.nih.gov/38623203/; *see also* Ipsita Kumar et al., *Limiting Rice and Sugarcane Residue Burning in Thailand: Current Status, Challenges and Strategies*, 276 J. OF ENV'T. MGMT. 111228 (2020), https://www.sciencedirect.com/science/article/abs/pii/S030147972031152X.

[26] Ramadan et al., *supra* n. 16.

[27] Most Louisiana cane farmers reportedly now slash rather than burn their cane before harvest. *Id.*

[28] Luciano Ito Perillo et al., *Avoiding Burning Practice and Its Consequences on the Greenhouse Gas Emission in Sugarcane Areas Southern Brazil*, 29 ENV'T SCIENCE AND POLLUTION RSCH. 719-30 (2022), https://pubmed.ncbi.nlm.nih.gov/34338981/ (also reflecting a net reduction of approximately 11 percent even where mechanized slashing utilized diesel equipment operations and where emissions measured over the course of the year rather than only during harvest season).

green harvesting is diesel-powered, studies show that green harvesting still emits roughly 11 percent fewer greenhouse gases than does burn harvesting.[29]

51. The climate benefits of green harvesting extend beyond the burn season, as studies have found that burned sugarcane fields subsequently release approximately 37 percent more soil bound carbon dioxide than non-burned (green-harvested) fields—due in large part to the lack of residual organic matter and the destabilization of soil in these intensively burned fields.[30] (Green-harvested cane fields, by comparison, are typically covered by roughly 13 tons of leftover crop residue post-harvesting, minimizing the escape of greenhouse gases and helping stabilize the soil.[31])

52. The science is clear: On a macro scale, farming using green harvesting methods is invariably better for the climate on the whole than farming using burn-harvesting.[32] Indeed, studies support that "the most important reduction in greenhouse gas emissions from sugarcane areas could be

[29] *Id.* (reflecting that the roughly 24 percent emissions reduction in the harvesting phase still easily results in net emissions savings when balanced against modest emission increases due to, e.g., diesel use from increased cane maintenance throughout the year); *see also* M.M Acreche et al., *Greenhouse Gas Emissions from Green-Harvested Sugarcane With and Without Post-Harvest Burning in Tucumán, Argentina*, 16 SUGAR TECH 195-99 (2014), https://link.springer.com/article/10.1007/s12355-013-0270-5 (supporting that despite higher emissions of nitrous oxide and carbon dioxide during the non-harvest (maintenance) season, green-harvested cane crops produced lower net greenhouse gas emissions on the whole than burn- harvested crops due to their steep reduction in harvest-time emissions).

[30] Mara Regina Moitinho et al., *Effects of Burned and Unburned Sugarcane Harvesting Systems on Soil CO2 Emission and Soil Physical, Chemical, and Microbiological Attributes*, 196 CATENA 104902 (2021), https://www.sciencedirect.com/science/article/abs/pii/S0341816220304537 (finding faster soil carbon emission rates (2.63 µmol $m^{-2}$ $s^{-1}$ versus 1.92 µmol $m^{-2}$ $s^{-1}$) and shorter oil-carbon half-lives (1,033.95 days versus 1,572.82 days) in burned areas than in unburned areas); *see also* Rose Luiza Moraes Tavares et al., *Soil Management of Sugarcane Fields Affecting CO2 Fluxes*, 73 SCIENTIA AGRICOLA 543-51 (2016), https://www.researchgate.net/publication/309407458_Soil_management_of_sugarcane_fields_affecting_CO2_fluxes; Alan Rodrigo Panosso et al., *Spatial and Temporal Variability of Soil CO2 Emission in a Sugarcane Area under Green and Slash-and-Burn Managements*, 105 SOIL AND TILLAGE RESEARCH 275-82 (2009), https://www.sciencedirect.com/science/article/abs/pii/S016719870900169X.

[31] Moitinho et al., *supra* n. 29; *see also* Mkhonza, Nontokozo, and Pardon Muchaonyerwa, *Effect of Sugarcane Residue Management (Pre-Harvest Burning versus Green Cane Retention) on Soil Organic Carbon Fractions and Aggregate Stability in Umbric Rhodic Ferralsols*, 70 SOIL SCIENCE AND PLANT NUTRITION (2024), https://www.tandfonline.com/doi/full/10.1080/00380768.2024.2317239 (While green harvesting may promote initial carbon dioxide emissions through microbial respiration due to increased soil health, long-term carbon sequestration outpaces that of burn- harvested fields.).

[32] *See SOIL: The Hidden Part of the Climate Cycle*, EUROPEAN COMMISSION (2011), https://climate.ec.europa.eu/system/files/2016-11/soil_and_climate_en.pdf; *see also* Moitinho et al., *supra* n. 29 (sugarcane slash-harvesting substantially more environmentally friendly and sustainable than burn-harvesting, even accounting for slight increases in emissions in discrete segments of green-harvested cane farming).

achieved by switching" from a burn-harvesting system to a green harvest system,[33] as such a transition can, e.g., allow sugar growers to sequester more than *seven tons* of carbon dioxide equivalent per hectare every year.[34]

53. As environmental experts put it, green harvesting "presents a higher potential for stabilizing soil carbon and reducing the contribution of agriculture to greenhouse gas emissions, especially CO2, when compared to the burned sugarcane system."[35]

54. Defendant's' claims—consistent across all Products, whether organic or traditional——that purchasing the purchase of the their Products supports farming that "help[s] fight climate change" through Defendants' sugarcane farming are thus necessarily false, misleading, and deceptive—and as a result, so, too, are their representations that the Products result from "Farming to Help Save the Planet." Florida Crystals, dDespite itstheir sophisticated knowledge of the comparative impacts of burn-harvesting and green harvesting, Defendants continues to make the deliberatemake the choice across the vast majority of its South Florida farming operations that is known to cause harm to people and the planet even though itthey could choose otherwise.

### 2. *Defendant's' Pre-Harvest Burns Also Harm the Planet through Localized Impacts*

55. In addition to contributing to (rather than fighting) climate change, Defendants through itstheir burn-harvesting approach to cane farming damages the environment in more localized fashions, further undermining Defendant's' label claims that the Products come from—and whose sales support—derive a company committed from to "Farming to Help Save the Planet." These harms include (1) localized air pollution and (2) soil damage.

---

[33] Eduardo Barretto de Figueiredo et al., *Greenhouse Gas Emission Associated with Sugar Production in Southern Brazil*, 5 CARBON BALANCE MGMT. (2010), https://cbmjournal.biomedcentral.com/articles/10.1186/1750-0680-5-3.

[34] *Id.*

[35] Moitinho et al., *supra* n. 29.

**a. Defendant's' Pre-Harvest Burns Severely Pollute Glades Air, as Evidenced by Elevated Rates of Smoke-Related Health Conditions Among Glades Residents**

56. Beyond greenhouse gases, pre-harvest cane burns have been shown to release a toxic mix of chemicals similar to that released through tobacco smoking.[36] But none of the pollutants Defendants releases through itstheir elective pre-harvest burning is more alarming than particulate matter, a mix of combusted debris and pollutants that kills tens of thousands of Americans annually—with people of color disproportionately affected.[37]

57. According to the EPA, agricultural interests in Palm Beach County emit more particulate matter from agricultural fires than any other county in the United States. Approximately 98.5 percent of this comes from sugarcane burns in the Glades—a zone where Florida Crystals farms close to half the cane acreage.

58. Even among particulate matters, PM2.5 is particularly insidious. These tiny toxins, measuring 1/30th the width of a human hair, can be easily inhaled, entering the lungs and even the bloodstream. From there, PM2.5 can and does cause severe health issues, including chronic asthma, heart and lung diseases, and premature death. Indeed, a 2022 study by scientists at Florida State University found that the fine particulate matter sugarcane-burning produces can be linked to *up to five deaths per year* in the region.[38]

59. While the World Health Organization has warned against exposure to PM2.5 levels exceeding 25 micrograms per cubic meter over a 24-hour period, there is no such standard for shorter-period exposures such as one-hour exposures.[39] And there is a growing recognition among experts that exposure to *any* amount of PM2.5 may be harmful to human health.[40] Even short exposures to PM2.5, such as those Florida Crystals and other cane-burning companies in the Glades

---

[36] Ramadan et al., *supra* n. 16.
[37] Christopher W. Tessum et al., *PM2.5 Polluters Disproportionately and Systemically Affect People of Color in the United States*, 7 SCIENCE ADVANCES (2021), https://www.science.org/doi/10.1126/sciadv.abf4491.
[38] Chrisopher D. Holmes, *Health Effects of Sugarcane Burning*, ATMOSPHERIC CHEMISTRY AND GLOBAL CHANGE RSCH. GROUP, https://acgc.eoas.fsu.edu/health-effects-of-sugarcane-burning/.
[39] Ramadan et al., *supra* n. 16.
[40] *Id.*

produce during burn season, have been shown to impair heart function, promote clot formation, and increase blood pressure.[41]

60. In their seminal and award-winning series multimedia project “Black Snow: Big Sugar’s Burning Problem,” *ProPublica* and *The Palm Beach Post* found through independent testing that PM2.5 levels spiked during peak cane-burning periods in the Glades, recording levels far exceeding the WHO-published 24-hour exposure limit of 25 micrograms per cubic meter during shorter periods multiple times over the course of a single day.[42]

61. Glades residents are all too familiar with the local environmental harm Defendants and Big Sugar unleash. This harm is visible—and, all too regularly, literally tangible—in the daily scenes of pre-harvest burn plumes rising above the cane fields during the long harvesting season.[43] Local residents commonly keep inhalers and nebulizers at home, remain indoors during harvest season, and become accustomed to brushing visible ash—the ubiquitous “black snow”—off their clothing, porches, and cars.[44] And local healthcare workers plan each year for a rush on asthma medications as harvest season approaches.[45]

62. Defendant’s’ localized air pollution also arrives in other forms: In addition to PM2.5, studies have shown that levels of carcinogenic polycyclic aromatic hydrocarbons (PAHs) in the region increase up to *15-fold* during cane harvesting season as compared to the summer growing (i.e., non-burning) season.[46]

---

[41] Env’t. Protection Agency, 85 Fed. Reg. 24094 (proposed Apr. 30, 2020) (to be codified at 40 C.F.R. pt. 50).
[42] Ramadan et al., *supra* n. 16.
[43] Harvesting season now stretches from October to May or June each year. *See* Michael Adno, *A Fire in the River: Big Sugar and ‘Black Snow’ in the Everglades*, ROLLING STONE (Jan. 7, 2024), https://www.rollingstone.com/culture/culture-features/sugar-crop-pollutants-florida-1234924707/.
[44] Ramadan et al., *supra* n. 16
[45] *Id.*; *see also* Gisele Galoustian, *FAU Lands $4.2 Million NIH Grant for Air Quality, Alzheimer’s Study*, NEWS DESK (Aug. 23, 2023), https://www.fau.edu/newsdesk/articles/agricultural-fires-grant-study.php.
[46] Orhan Sevimoglu & Wolfgang F. Rogge, *Seasonal Size-Segregated PM10 and PAH Concentrations in a Rural Area of Sugarcane Agriculture Versus a Coastal Urban Area in Southeastern Florida, USA*, 28 PARTICUOLOGY 52-59 (2016), https://www.sciencedirect.com/science/article/abs/pii/S1674200115002096 (reflecting growing body of evidence of other health conditions tied to Black Snow exposure—specifically, increased risks of developing Alzheimer’s and other dementias, subject of an ongoing 5-year Florida Atlantic University study funded by a $4.2 million National Institutes of Health grant)

**b. Defendant's' Decision to Use Pre-Harvest Burns Rather than Green Harvesting Damages Glades Soil**

63. Also contrary to Defendant's' label claims that itstheir Product cane farming "helps build healthy soil," burning sugarcane before harvest in fact *worsens* soil health compared to green harvesting by removing organic matter—which, in turn, deprives the soil of moisture, nutrients, and microbial life.[47] Burn-harvesting also disrupts and compacts soil structure, reduces carbon storage and long-term soil fertility, and promotes erosion of the soil within the burn zone.[48]

64. Green harvesting, in contrast, retains cane residue, which promotes soil carbon sequestration—protecting the soil's health while also preventing the release of greenhouse gases into the atmosphere.[49] This residue also returns nitrogen to the soil, reducing the need for fertilizers over time.[50]

65. By choosing to burn-harvest the bulk of thetheir Glades cane fields it uses to produce used in Florida Crystals-branded consumer sugar productsproduction, Defendants consciously selected—and continues to use—a method that produces markedly *worse* soil quality under several criteria. This renders Defendant's' front-label claims that Florida Crystals' farming "helps build healthy soil" patently false, misleading, and deceptive.

**B. Defendants Also Harms Rather than "Saves" the Planet through itstheir Operation's Impacts on South Florida Waters**

66. Defendant's' current and historical impacts on South Florida waters further establish that Defendants and itstheir sugarcane-farming practices do not "Help Save the Planet." Along with Big Sugar co-leader U.S. Sugar Corporation, Florida CrystalsDefendants hasve harmed the region's aquatic environments by severely disrupting the region's hydrology and aquatic ecosystems

[47] Moitinho et al., *supra* n. 29 (soil carbon emission rate considerably higher—and half-life considerably shorter—in burned fields than in non-burned fields).
[48] *Id.*
[49] Ito Perillo et al., *supra* n. 27.
[50] M.V. Basanta et al., *Management effects on nitrogen recovery in a sugarcane crop grown in Brazil*, 116 GEODERMA 235-248, 2003, https://www.sciencedirect.com/science/article/pii/S0016706103001034.

through its Florida Crystals' occupation of hundreds of thousands of acres of land that historically composed the northern reaches of the Everglades.[51]

67. Big Sugar's pollution disrupts the ecosystems of local waterways, including Lake Okeechobee, causing deadly algal blooms, promoting the aggressive growth of aquatic species like cattails to the detriment of other species, and depriving estuarial habitats such as Biscayne Bay of essential flushes of clean freshwater.[52]

67.68. Additionally, Lake Okeechobee waters, laden with phosphorous and other eutrophic fertilizers, are now routinely redirected from into the St. Lucie River to the east and Caloosahatchee River to the west due in part to the Big Sugar's Defendant's success in securing priority rights to taxpayer-funded stormwater treatment areas ("STAs") for agricultural runoff instead of Lake Okeechobee outflow.[53] With Defendant and other major agricultural operators dominating STA storage for their farm runoff,[54] polluted lake water is rerouted away from its natural southward flow and into these riversThis redirection, in turn, sparkings further deadly algal blooms as the polluted water descends these rivers.[55]

68.69. Florida Crystals, as one of the largest landholders in the EAA separating Lake Okeechobee from what remains of the Everglades, plays a leading role in Big Sugar's disruption

---

[51] Amy Green, *Billions of Gallons of Freshwater Are Dumped at Florida's Coasts. Environmentalists Want That Water in the Everglades*, INSIDE CLIMATE NEWS (June 18, 2024) https://insideclimatenews.org/news/18062024/everglades-wetlands-toxic-algae-pollution/ (detailing Big Sugar's dominant role in EAA's blockage of natural southward water flow through "River of Grass" into heart of surviving portion of Everglades along with correlated redirection of now-polluted water flow to Lake Okeechobee and outflow waterways to ocean).

[52] Green, *supra* n. 49; *see also* Tim Padgett, *'Not Even Close': Clean-Up of Everglades Water Polluted by Big Sugar Struggles to Keep Up*, WLRN PUBLIC MEDIA (Dec. 6, 2023) https://www.wlrn.org/environment/2023-12-06/everglades-restoration-sugar-farms-phosphorous-water (noting how "Florida's Big Sugar barons, such as Alfonso Fanjul, whose family owns Florida Crystals, have for decades resisted state and federal efforts to cede the land necessary for vital water storage and clean-up").

[53] *Deep Dive: If the STAs Were Reserved for Lake Water, Lake O Might Be Below 13 Feet Now*, VOTEWATER, https://votewater.org/deep-dive-if-the-stas-were-reserved-for-lake-water-lake-o-might-be-below-13-feet-now/.

[54] *Spotlight On: Stormwater Treatment Areas*, FRIENDS OF THE EVERGLADES (Jan. 31, 2023) https://www.everglades.org/spotlight-on-stormwater-treatment-areas/ (reporting that Lake Okeechobee runoff accounted for only 10.5 percent of STA water storage during the prior water year).

[55] *Deep Dive: If the STAs Were Reserved for Lake Water, Lake O Might Be Below 13 Feet Now, supra* n. 53 *Id.*; *see also How the Federal Sugar Program Leads to Dirtier Water*, VOTEWATER, https://votewater.org/how-the-federal-sugar-program-leads-to-dirtier-water/ (noting the direct role of Defendant and Big Sugar through their dominance of STA capacity in forcing discharge of Lake Okeechobee water to the St. Lucie and Caloosahatchee estuaries, "where it crashes salinity levels, boosts turbidity, feeds red tide and fosters massive blooms of toxic blue-green algae").

of the natural southward flow of the "River of Grass" as well as the eutrophication of natural waterways through runoff of fertilizers, including phosphorous, it uses on its farms.[56]

69.70. Indeed, Defendants to this day continues to pursue profit over concerns for South Florida waterways—most recently, in the form of itstheir Southland Water Resource Project limestone rock mine, which the Palm Beach County Commission approved last yearmonth despite concerns that the 34-year project could "cripple future Everglades restoration projects."[57]

70.71. Through itstheir actions, Defendants both starves the Everglades of essential replenishing clean water inflow and contributes through itstheir redirection of polluted water to the eutrophication of Lake Okeechobee, outflow rivers, and ultimately Florida's estuarial and oceanic aquatic ecosystems. Defendant's' impacts on South Florida waters thus further render Defendant's' Product label claims that Florida Crystals the Products derive from farms that "Help Save the Planet"—and that consumers' purchases of the Products thus *support* that outcomework—false, misleading, and deceptive.

**C. Consumers Were Misled by the Challenged Representations to Their Detriment**

71.72. On average, the American consumer takes only about 13 seconds to make an in-store purchasing decision and 19 seconds to purchase goods online.[58] These decisions rely heavily on what consumers first see when considering the product: its packaging and front-label claims.[59]

72.73. At the same time, studies show that consumers are willing to pay more for products when they believe their purchasing decisions will benefit the environmentare environmentally

---

[56] Padgett, *supra* n. 50; *see also* Amy Green, *In Florida, State Rules Concentrate Toxic Smoke in Underserved Communities*, INSIDE CLIMATE NEWS (Mar. 10, 2025), https://insideclimatenews.org/news/10032025/florida-sugar-toxic-smoke-underserved-communities/ (noting the EAA's major sugar growers' role in the watershed's degradation as well as their "resistance through the years to various means of tackling the problem," with the State of Florida having "invested some $2 billion toward addressing the farmers' pollution" as a result in addition to multi-billion-dollar federal funding of related restoration efforts); Mary Williams Walsh, *Florida Deal for Everglades May Help Big Sugar,* NEW YORK TIMES (Sept. 13, 2008), https://www.nytimes.com/2008/09/14/business/14fanjul.html?dbk (noting the historical role of large agricultural companies such as Florida Crystals in depriving the Everglades of "regular flooding that wetlands need").

[57] Timothy O'Hara, *Palm Beach County approves sugar rock mine in Everglades despite Treasure Coast opposition*, TREASURE COAST NEWS (May 22, 2025), https://www.tcpalm.com/story/news/local/indian-river-lagoon/2025/05/22/palm-beach-county-commission-to-vote-on-florida-crystals-sugar-rock-mine-in-everglades/83771283007/.

[58] Randall Beard, *Make the Most of Your Brand's 20-Second Window*, NIELSEN (Jan. 2015), https://www.nielsen.com/us/en/insights/article/2015/make-the-most-of-your-brands-20-second-windown/.

[59] *Id.*

~~friendly~~.[60] Yet studies show that a significant majority of consumers cannot readily define even the most commonplace of general environmental benefit marketing claims."[61]

~~73.~~74. Sophisticated corporations~~Consumer products companies~~ like Defendant~~s~~ know this. And the unscrupulous among them exploit this intersection of consumer attention and demand by promoting their products using false, misleading, or deceptive environmental claims—i.e., greenwashing.

~~74.~~75. Recognizing this problem, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid making misleading and deceptive claims.[62] The Green Guides specifically address "general environmental benefit claims," such as Defendants' Challenged Representations, that are generally "deceptive to misrepresent, directly or by implication, that a product, package, or service offers a general environmental benefit," as "general environmental benefit claims are difficult to interpret and likely convey a wide range of meanings," including, for example, "that the product, package, or service" likely "has specific and far-reaching environmental benefits" and/or "that the item or service has no negative environmental impact."[63]

~~75.~~76. The Green Guides further state that"[b]ecause it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, marketers should not make unqualified general environmental benefit claims," and "should not imply that any specific benefit is significant if it is, in fact, negligible."[64] ~~Finally, t~~The Green Guides hold that where "a qualified general claim conveys that a product is more environmentally beneficial overall because of the particular touted benefit(s), marketers should analyze trade-offs resulting from the benefit(s) to determine if they can substantiate this claim," though "[e]ven if a marketer explains, and has substantiation for, the product's specific environmental attributes, this explanation will not

[60] Sherry Frey et al., *Consumers care about sustainability—and back it up with their wallets*, MCKINSEY & CO. (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets/

[61] *See* Soren Amelang, *"Climate Neutral" Product Labels Mislead Vast Majority of Consumers*, CLEAN ENERGY WIRE (Sep. 26, 2022), https://www.cleanenergywire.org/news/climate-neutral-product-labels-mislead-vast-majority-consumers-survey (analyzing study finding that only three of 100 participants understood scope of "carbon neutral" marketing claim).

[62] *See generally* 16 C.F.R. § 260 – Guides for the Use of Environmental Marketing Claims.

[63] 16 C.F.R. § 260.4

[64] *Id.*

adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims."[65]

77. The Green Guides also analyze the potential misleading effect of the phrase "Eco-Friendly," concluding that the phrase "likely conveys that the product has far-reaching environmental benefits and may convey that the product has no negative environmental impact. Because it is highly unlikely that the marketer can substantiate these claims, the use of such a brand name is deceptive."[66]

78. Elected officials and state regulators in California and elsewhere have gone further, adopting and enforcing stringent reporting requirements—generally focused on the essential role of substantiation in preventing consumer deception—for companies that choose to use environmental marketing claims to increase sales while encouraging federal regulators to follow suit.

79. For example, a coalition of attorneys general from California and 14 other states as well as the District of Columbia urged the FTC in April 2023 to adopt heightened substantiation standards for general environmental benefit claims through long-awaited updates to the Green Guides. In comments submitted to the agency, the coalition noted that such marketing claims were particularly vulnerable to *multiple reasonable interpretations*, observing that, e.g., "the scope of a "carbon neutral" claim often is unclear, and reasonable consumers may assume that such a claim applies to the entire production and supply chain of a product, or to a company's entire operation."[67]

80. The state regulators authors also noted that "comparative" environmental claims were highly susceptible to different reasonable interpretations, urging the FTC to revise the Green Guides to require more stringent substantiation as to these claims as well.[68]

---

[65] *Id.*

[66] *Id.*

[67] Bonta, Rob, et al., *Green Guides Review, Matter No. P954501*, at 16 (April 24, 2023), https://oag.ca.gov/system/files/attachments/pressdocs/Comments%20to%20FTC%20re%20Green%20Guides%204.24.23.pdf.

[68] *Id.* at 17-18 (emphasizing that such claims must be clear and substantiated to minimize their propensity to mislead reasonable consumers).

81. Finally, the coalition of regulators also encouraged the FTC to revise Section 260(b) of the Green Guides to highlight the specific challenge associated with climate change-related marketing claims, recommending that the agency add the following language:

> Research suggests that reasonable consumers may interpret claims that a product, service, operation, or company is "carbon neutral," "climate neutral," "net zero, "carbon negative," "low carbon," or any other term that suggests a product or its production or a service, company, or operation has a neutral, positive, or minimal impact on climate change differently than marketers may intend. **Unless marketers have substantiation for all their express and reasonably implied climate change-related claims, marketers should clearly and prominently qualify their climate change-related claims.** For instance, marketers may minimize the risk of deception by specifying whether the term "carbon neutral" applies to the production of a product, the pre- or post-production supply chain, or a company's greater operations as they relate to the product.[69]

82. The California Department of Justice's participation in the coalition's submission of Green Guides comments mirrors recent California legislation enacted in this space, with companies now required to substantiate their climate-related marketing claims, including assertions that they have made significant reductions to their carbon dioxide or greenhouse gas emissions.[70]

83. Defendant iss are among the companies that engages in the exact sorts of greenwashing the Green Guides and California regulators and legislators warn against, capitalizing on growing consumer demand for purportedly environmentally friendly products through its selection and placement presentation of the Product claimstheir Product presentation: On the Products' front labels, Defendants represents that the Products are results ofcome from—and, in turn, whose sales support—a company that is "Farming to Help Save the Planet" through farms that "help[s] fight climate change & build healthy soil," presenting the claims to consumers on green-dominated packaging. These Challenged Representations squarely qualify as the sort of general environmental

[69] *Id.* (emphasis added)

[70] Cal. Health & Safety Code § 44475.2 (codifying AB 1305); *see also* Cal. Bus. & Prof. Code § 17580 (requiring companies marketing consumer goods as "not harmful to, or . . . beneficial to, the natural environment, through the use of such terms as "environmental choice," "ecologically friendly," "earth friendly," "environmentally friendly," "ecologically sound," "environmentally sound," "environmentally safe," "ecologically safe," "environmentally lite," "green product," or any other like term" to maintain written specified records to substantiate the claim).

benefit claims federal and state regulators warn are inherently vulnerable to misleading reasonable consumers. For example, the label claim "Farming to Help Save the Planet" is highly analogous to the claim of "Eco-Friendly"—a claim that promises "far-reaching environmental benefits" to Plaintiff and other reasonable consumers yet in defying easy substantiation is inherently "deceptive."[71]

84. Tellingly, nowhere on the Products' packaging does Defendant attempt to meaningfully substantiate *any* of these general environmental benefit claims.[72]

85. Nor, more narrowly, does Defendant "clearly and prominently qualify" its label claim that Florida Crystals farms "help fight climate change," seemingly running afoul of the 2023 recommendations from the California Department of Justice and regulators from 14 other states as to climate change-related marketing claims—recommendations that flowed directly from these authorities' efforts to identify and protect the reasonable consumer in this context from being deceived.[73]

~~1.~~86. As such, t~~T~~he Challenged Representations are paradigmatic examples ~~se claims constitute the exact sort~~ of the class of difficult- or impossible-to-substantiate general environmental benefit claims the Green Guides, legislators, and state regulatory agencies caution against~~condemn~~. The total absence of information on the Product labels attempting to define or substantiate the Challenged Representations renders Defendant's label claims highly likely to deceive reasonable consumers.[74]

~~2. Defendants perpetuate these false claims with Florida Crystals' overall branding, which centers on purported assurances of sustainable farming practices.~~

---

[71] 16 C.F.R. § 260.4.

[72] Defendant through text on the Products' back labels does, e.g., tout its efforts to support "local habitats for pollinators and birds" and assert that its operations pull "carbon from the air and [store] it in the soil." None of these less-prominent claims serve to substantiate—or even more sharply define—any of the Challenged Representations.

[73] Bonta, *supra* n. 66, at 17-18.

[74] Some of the Products contain additional front-label text identifying those Products as "USDA Organic," "Regenerative Organic Certified," and "Non-GMO Project Verified." Reasonable consumers like Plaintiff do not and would not read those to either substantiate or limit the Challenged Representations. To the contrary, reasonable consumers would interpret these additional claims as speaking only to organic certification status and GMO use rather than to whether Defendant's farms benefit the environment, help fight climate change, or help build healthy soils—i.e., to mean *what they actually say*.

~~3.~~87. Defendant perpetuates these false claims with Florida Crystals’ overall branding, which centers on purported assurances of sustainable farming practices. And Florida Crystals’ marketing web copy reinforces and amplifies the Products’ false labeling, further assuring ~~portraying the Products as sustainably grown, harvested, and processed—i.e., in a manner that assures the~~ prospective customers that their purchase of the Products will support a company whose farming operations protect or otherwise benefit the environment, fight climate change, and improve soil quality when in fact the opposite is true.~~that cares first and foremost about environmental stewardship and fighting climate change.~~

~~4.~~88. As a result of Defendant’s~~’~~ explicit misrepresentations, reasonable consumers are led to believe that ~~Defendants farm, harvest, and process their sugar Products in the most eco-friendly manners possible—i.e., such that~~ buying Florida Crystals’ ~~the~~ Products will help save the planet, fight climate change, and build healthy soils by supporting Defendant and its farming operations. Through this positioning, Florida Crystals distinguishes itself—and the Products whose label marketing relies on Defendant’s purported companywide attributes—in a highly competitive market.

~~5.~~89. **Products.** Defendant~~s~~ manufactures, markets, promotes, advertises, labels, and sells several varieties of organic and non-organic sugar Products in multiple sizes, including in single and multi-packs. Each of these Products carries one or more of the Challenged Representations on its front-facing label.

~~6.~~90. **The Challenged Representations.** On the Products’ front labels, Defendant~~s~~ conspicuously displays the Challenged Representations. Specifically, Defendant~~s~~ falsely and misleadingly presents ~~label~~ the Products as vehicles to support Florida Crystals’~~deriving from~~ “Farming to Help Save the Planet~~,~~” as well as its~~and/or from~~ farms that “help fight climate change & build healthy soil.”

~~7.~~91. **Reasonable Consumer’s Perception.** The Challenged Representations and marketing claims lead reasonable consumers, like Plaintiff, to believe that purchasing the Products will—through supporting Florida Crystals’ farming operations—benefit~~are beneficial to~~ the Earth

and soil and help fight climate change. Many consumers are interested in purchasing products, including sugars for household consumption, whose production does not harm the natural environment, including by contributing to climate change. Similarly, many consumers are interested in purchasing products whose manufacturers and/or sellers have taken proactive measures to offset or otherwise reduce the any climate or other environmental harm of their operationscaused through their production. Front-label representations, such as the Challenged Representations, are material to such consumers' purchasing decisions. However, contrary to the Challenged Representations, purchasing Defendant's' Products neither benefits are neither beneficial to the Earth's natural systems nor effective helps combatin combatting climate change due to the realities of Defendant's EAA farming practices as a whole.

8.92. **Materiality.** The Challenged Representations are material to reasonable consumers, including Plaintiff, in deciding whether to buy the Products at their listed prices because it is important to a reasonable consumer whether a products presented as distinctivelyuniquely beneficial to the environment, climate, and soil through its purchaseeco-friendly and effective in fighting climate change really *is actually so*possess these qualities. This is particularly trueso where, as here, the Challenged Representations through their falsity induce reasonable consumers to invest in products that in fact oppose the very things they tell consumers they will support through their purchases. Plaintiff and other reasonable consumers concerned about environmental protection and climate change seek out and are willing to pay more for products affirmatively presented to consumers as an opportunity to use their purchasing power to protect or repair the environment and as protecting the environment and fighting climate change. Defendant's' representations thus motivate Plaintiff to buy the Products—either at all or at the price premiums at which they're sold.

9.93. **Reliance.** The Class, including Plaintiff, reasonably relied on the Challenged Representations in deciding to purchase the Products, as Plaintiff, as well as the Class, made their purchase decisions at least in part based on their reasonable belief that their purchase of they would receivethe Products would support large-scale farming that helpsthat protect and otherwise benefit

the Earth's natural environments, helps fight climate change, and/or helps create healthy soils based on Defendant's' Challenged Representations.

10.94. **Falsity.** The Challenged Representations are false, misleading, and deceptive because, contrary to the Challenged Representations, Defendant's' farming operationspractices *harm* the environment as well as the soil of the Glades and contribute to climate change rather than, rendering the Products decidedly *not* derived from farms that "Help Save the Planet," "fight climate change," or "build healthy soil." The Challenged Representations on the Products' front labels are therefore literally false.

11.95. **Consumers Lack Knowledge of Falsity.** Plaintiff and the proposed Class Members had no reason to know at the time of purchase that the Products' Challenged Representations are false, misleading, deceptive, and unlawful. Consumers rely on the Challenged Representations to mean purchasing the Products would, through and Defendant'ss' farming practices, help save the planet and build healthy and Glades soils while combatting climate change. Unlike Defendants, Plaintiff and the proposed Class Members do not possess the specialized knowledge required to conclude whether the Challenged Representations' claims of the generalized environmental benefits of DefendaFlorida Crystals' farming operations are accurate.nts' Products carrying the Challenged Representations or the farming practices behind them were truly beneficial for the Earth's natural environments or Glades soils, or whether these farming techniques help fight climate change.

12.96. **Defendant's' Knowledge.** Defendants knew or should have known that the Challenged Representations were false, misleading, deceptive, and unlawful at the time itthey manufactured, marketed, advertised, labeled, and sold the Products using the Challenged Representations to Plaintiff and the Class.

a. **Knowledge of Reasonable Consumers' Perception.** Defendants knew or should have known that the Challenged Representations "Farming to Help Save the Planet" and farms that "help fight climate change & build healthy soil" would lead reasonable consumers to believe that purchasing the Products' promoted through

~~front-label claims that the~~would supports farming operations ~~y derive from "Farming to Help Save the Planet" and/or from farms that "help fight climate change & build healthy soil" were in fact beneficial to~~that benefited the planet's natural environments, ~~Glades~~ soils, and efforts to combat climate change. Not only has~~ve~~ Defendant~~s~~ utilized a longstanding brand strategy in electing to promote the Products with general environmental benefit label claims concerning Defendant's cultivated companywide "green" brand identity,~~utilized a longstanding brand strategy to identify the Products as produced using sustainable and environmentally friendly methods,~~ but it~~they~~ also has~~ve~~ an obligation under Section 5 of the Federal Trade Commission Act, codified at 15 U.S.C. Section 45, *et seq*., to evaluate its~~their~~ marketing claims from the perspective of the reasonable consumer. That means Defendant wass ~~were~~ statutorily obligated to consider whether the Challenged Representations, be they in isolation or conjunction with its marketing strategy, would mislead reasonable consumers into believing that buying the Products would help save the planet, fight climate change, and build healthy soils. Thus, Defendant~~s~~ either knew that the Challenged Representations were misleading before it~~they~~ marketed the Products to the Class, including Plaintiff, or Defendant~~s~~ would have known that the Challenged Representations~~they~~ were deceptive had it~~they~~ complied with its~~their~~ statutory obligations.

b. **Knowledge of Falsity.** Defendant~~s~~ manufactured and marketed the Products with the Challenged Representations, but~~ they~~ opted to make Products that do not conform with the representations. Specifically, Defendant~~s~~ advertised and labeled the Products with the Challenged Representations but chose to harm the environment and contribute to—rather than combat—climate change by systematically using burn-harvesting farming methods and contributing to South Florida's water quality issues.

c. **Knowledge of Materiality.** Defendant~~s~~ knew or should have known of the Challenged Representations' materiality to consumers. ***First***, manufacturers and marketers, like Defendant~~s~~, generally reserve the front primary display panel of labels on consumer products for the most important and persuasive information, which they believe will motivate consumers to buy the products. Here, the conspicuousness of the Challenged Representations on the Products' labels demonstrates Defendant's~~'~~ awareness of that~~its~~ placement's importance to consumers and Defendant's~~'~~ understanding that consumers prefer and are motivated to buy products that conform to the Challenged Representations. ***Second***, manufacturers and marketers repeat marketing claims to emphasize and characterize a brand or product line, shaping the consumers' expectations, because they believe those repeated messages will drive consumers to buy the Products. Here, Defendant's~~'~~ consistent use of the Challenged Representations on countless Products and throughout its~~their~~ Florida Crystals marketing campaign demonstrates Defendant's~~'~~ awareness that the falsely advertised Product attributes of helping save the planet, fight climate change, and build healthy soils were and are important to consumers. This also establishes Defendant's~~'~~ intent to convince consumers that the Products conform to the Challenged Representations and, ultimately, drive Product sales. Thus, Defendant~~s~~ knew, in designing the Products, that the Challenged Representations were material to consumers—and the sales-driven revenue they represent to the company.

d. **Defendant's~~'~~ Continued Deception, Despite Its~~Their~~ Knowledge.** Defendant~~s~~, as the manufacturer and marketer of the Products, had exclusive control over the Challenged Representations' inclusion on the Products' labels and advertisements—i.e., Defendant~~s~~ readily and easily could have stopped using the Challenged Representations to sell the Products. However, despite Defendant's~~'~~ knowledge of both the Challenged Representations' falsity and the reasonable consumer's reliance

on the prominent, front-label Challenged Representations in deciding whether to buy the Products, Defendants deliberately chose to market the Products with the Challenged Representations, thereby misleading consumers into buying or overpaying for the Products. Thus, Defendants at all relevant times knew or should have known that the Challenged Representations misled and continue to mislead reasonable consumers, such as Plaintiff and the proposed Class Members, into buying the Products to attain the Product attributes that Defendants falsely advertised and warranted.

13.97. **Detriment.** Plaintiff and similarly situated consumers would not have purchased the Products—or would not have overpaid a price premium for them—had they known that the Challenged Representations were false and misleading and, therefore, that purchasing the Products does not in fact support not come from farming operationspractices that on the whole help save the planet, fight climate change, or build healthy soils as Defendants claimed, promised, warranted, advertised, and/or represented. Accordingly, based on Defendant's' Challenged Representations, reasonable consumers, including Plaintiff and the proposed Class Members, purchased the Products to their detriment.

**D. The Products Are Substantially Similar**

14.98. As described herein, Plaintiff purchased the Florida Crystals Regenerative Organic Raw Cane Sugar Product in the two-pound bag size (the "**Purchased Products**") on multiple occasions.

76.99. The Florida Crystals Regenerative Organic Raw Cane Sugar Product in the two-pound bag size and the other Products detailed above in all listed sizes and combinations (the "**Unpurchased Products**") are substantially similar to the Purchased Products.

a. **Defendants.** All Products are manufactured, sold, marketed, advertised, and labeled by Defendants.

b. **Marketing Demographics.** All Products are marketed directly to consumers for personal consumption.

c. **Purpose.** All Products are sugar products sold to consumers for everyday home use.

d. **Use.** All Products are used in the same manner: consumed as food.

e. **Challenged Representations.** All Products—both organic and conventional—contain one or more of the Challenged Representations on their front labels—further supporting that Plaintiff and other consumers would reasonably interpret the claims as referencing Defendant’s farming operations *writ large* rather than referring more narrowly to the farming practices on only Defendant’s organic *or* conventional cane fields.

f. **Packaging.** All Products are similarly packaged, with the only relevant distinctions being (1) the Product size (whether sold solo or as part of a multi-pack) and (2) whether their packaging is from the older or newer marketing campaign (though all share the same claim of being beneficial to the Earth).

g. **Key Attributes.** All Products are advertised as ~~derived from~~produced by a company dedicated to and actively engaged in~~ and supporting~~ “Farming to Help Save the Planet” and whose~~and~~ farms ~~that~~ “help fight climate change & build healthy soil.”

h. **Misleading Effect.** The misleading effect of the Challenged Representations on consumers is the same for all Products in that consumers overpay for products whose purchase they are led to believe supports farming that on its whole benefits ~~to be good for~~ the Earth and its soil while ~~as well as~~ effectively ~~in~~ fighting climate change when, in reality, ~~none of~~ Defendant’s~~’~~ farming practices ~~Products~~ do not on the whole ~~derive from farming that~~ help~~s~~ save the planet, fight climate change, or build healthy soils due to Defendant’s~~’~~ systemic burn-harvesting and detrimental impact~~effect~~ on South Florida waters~~ways~~.

## E. No Adequate Remedy at Law

~~15.~~100. **No Adequate Remedy at Law.** Plaintiff and Class Members are entitled to equitable relief because no adequate remedy at law exists.

1. **Broader Statutes of Limitations.** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations under the FAL and CLRA. In addition, the statutes of limitations vary for certain states’ laws for breach of warranty and unjust enrichment/restitution (i.e., between approximately two and six years). Thus, California Subclass members who purchased the Products more than three years prior to the filing of the complaint would be barred from recovery if equitable relief were not permitted under the UCL. Similarly, Nationwide Class members who purchased the Products prior to the furthest reach-back under the statute of limitations for breach of warranty would be barred from recovery if equitable relief were not permitted for restitution/unjust enrichment.

2. **Broader Scope of Conduct.** In addition, the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. This includes, for example, Defendant’s’ overall unfair marketing scheme to promote and brand the Products with the Challenged Representations across a multitude of media platforms, including the Products’ labels and Florida Crystals’ website and official Amazon.com store, over a long period of time in order to gain an unfair advantage over competitor products and to exploit consumers’ desire for products that comport with the Challenged Representations. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations made on the type of products at issue). Thus, Plaintiff and Class Members may be entitled to restitution under the UCL while not entitled to damages under other causes of action asserted herein (e.g., the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes), and other statutorily enumerated conduct). Similarly, unjust enrichment/restitution is broader than breach of warranty. For example, in some states, breach of warranty may require a showing of privity of contract or pre-lawsuit notice—neither of which is typically required

to establish unjust enrichment/restitution. Thus, Plaintiff and Class Members may be entitled to recover under unjust enrichment/restitution while not entitled to damages under breach of warranty where they purchased the Products from third-party retailers or did not provide adequate notice of a breach prior to the commencement of this action.

3. **Injunctive Relief to Cease Misconduct and Dispel Misperception.** Injunctive relief is appropriate on behalf of Plaintiff and Class Members because Defendants continues to misrepresent the Products with the Challenged Representations. Injunctive relief is necessary to prevent Defendants from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures or other corrective action, is necessary to dispel the public misperception about the Products that has resulted from years of Defendant’s’ unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements providing accurate information about the Products’ true nature; and/or requiring prominent qualifications and/or disclaimers on the Products’ front labeling concerning the Products’ true nature. An injunction requiring affirmative disclosures to dispel the public’s misperception and prevent the ongoing deception—and repeat purchases based thereon—is also not available through a legal remedy (such as monetary damages). In addition, Plaintiff is currently unable to accurately quantify the damages caused by Defendant’s’ future harm because discovery and Plaintiff’s investigation have not concluded, rendering injunctive relief all the more necessary. For example, because the Court has not yet certified any class, the following remains unknown: the scope of the class, the identities of its members, prices of past/future Product sales, and quantities of past/future Products sales.

4. **Public Injunction**. Further, because a “public injunction” is available under the UCL, damages would not adequately “benefit the general public” in a manner equivalent to an injunction.

5. **California v. Nationwide Class Claims**. Violations of the FAL, CLRA, and UCL are claims asserted against Defendants on behalf of Plaintiff and the California Subclass, while breaches of express and implied warranty and unjust enrichment/restitution are asserted on behalf of Plaintiff and the Nationwide Class. Dismissal of farther-reaching claims, such as restitution, would bar recovery for non-California members of the Nationwide Class. In other words, legal remedies available or adequate under the California-specific causes of action (such as the FAL, CLRA, and UCL) have no impact on this Court's jurisdiction to award equitable relief under the remaining causes of action asserted on behalf of non-California putative class members.

## VII. CLASS ACTION ALLEGATIONS

16.101. **Class Definition.** Plaintiff brings this action as a class action on behalf of themselves and all others similarly situated as members of the Class defined as follows:

- All residents of the United States who, within the applicable statute of limitations periods, purchased the Products containing one or more of the Challenged Representations on the Products' labels for purposes other than resale ("**Nationwide Class**"); *and*
- All residents of California who, within four years prior to the filing of this action, purchased the Products containing one or more of the Challenged Representations on the Products' labels for purposes other than resale ("**California Subclass**").

The "Nationwide Class" and "California Subclass" are collectively referred to as the "**Class.**"

17.102. **Class Definition Exclusions.** Excluded from the Class are: (i) Defendants, itstheir assigns, successors, and legal representatives; (ii) any entities in which Defendants hasve controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

~~18.~~103. **Reservation of Rights to Amend the Class Definition.** Pursuant to California Civil Code Section 382, Plaintiff reserves the right to amend or otherwise alter the Class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant~~s~~, or otherwise.

~~19.~~104. **Numerosity.** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the state of California. Accordingly, it would be impracticable to join all members of the Class before the Court.

~~20.~~105. **Common Questions Predominate.** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. These common questions of law or fact include:

1. Whether Defendant~~s~~ engaged in unlawful, unfair, or deceptive business practices by advertising and selling the Products in the manners alleged;
2. Whether Defendant's~~'~~ labeling and advertising of the Products is misleading in violation of Business and Professions Code Section 17500, *et seq*.;
3. Whether Defendant~~s~~ knew or by the exercise of reasonable care should have known that its~~their~~ labeling and advertising was and is misleading in violation of Business and Professions Code Section 17500, *et seq*.;
4. Whether Defendant's~~'~~ conduct of advertising and selling the Products with the Challenged Representations despite ~~their creation of~~ Florida Crystals' farming operations ~~the Products~~ *not* helping "Save the Planet, "Fight Climate Change," or "Build Healthy Soils" constitutes an unfair method of competition or unfair or deceptive act or practice in violation of Civil Code Section 1750, *et seq*.;
5. Whether Defendant~~s~~ used deceptive representations in connection with the sale of the Products in violation of Civil Code Section 1750, *et seq*.;

6. Whether Defendants represented that the Products have characteristics that they do not have in violation of Civil Code Section 1750, *et seq*.;

7. Whether Defendants advertised the Products with intent not to sell them as advertised in violation of Civil Code Section 1750, *et seq*.;

8. Whether Defendant's' conduct is an unfair business practice within the meaning of Business and Professions Code Section 17200, *et seq*.;

9. Whether Defendant's' conduct is a fraudulent business practice within the meaning of Business and Professions Code Section 17200, *et seq*.;

10. Whether Defendant's' conduct is an unlawful business practice within the meaning of Business and Professions Code Section 17200, *et seq*.;

11. Whether Plaintiff and the Class paid more money for the Products than they actually received;

12. How much more money Plaintiff and the Class paid for the Products than they actually received;

13. Whether Defendant's' conduct constitutes breach of warranty;

14. Whether Plaintiff and the Class are entitled to injunctive relief; *and*

15. Whether Defendants wasere unjustly enriched through itstheir unlawful conduct.

21.106. **Predominance**. The common questions of law and fact predominate over questions that affect only individual Class Members.

22.107. **Typicality.** Plaintiff's claims are typical of the claims of the Class Members they seek to represent because Plaintiff, like the Class Members, purchased Defendant's' misleadingly and deceptively advertised Products. Defendant's' unlawful, unfair, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff and the Class sustained similar injuries arising out of Defendant's' conduct. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

23.108. **Adequacy.** Plaintiff is an adequate representative of the Class she seeks to represent because Plaintiff's interests do not conflict with the interests of the Class Members they seek to represent. Plaintiff will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

24.109. **Ascertainability.** Class Members can easily be identified by an examination and analysis of the business records regularly maintained by Defendants, among other records within Defendant's' possession, custody, or control. Additionally, further Class Member data can be obtained through additional third-party retailers who retain customer records and order histories.

25.110. **Superiority and Substantial Benefit.** A class action is superior to other methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

1. The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;
2. Absent a Class, the members of the Class will continue to suffer damage and Defendant's' unlawful conduct will continue without remedy while Defendants profit from and enjoys their ill-gotten gains;
3. Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;
4. When the liability of Defendants has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; *and*

5. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendant~~s~~.

~~26.~~111. **Inconsistent Rulings.** Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual proposed Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would threaten to establish incompatible standards of conduct for Defendant~~s~~.

~~27.~~112. **Injunctive/Declaratory Relief.** The prerequisites to maintaining a class action for injunctive or equitable relief are met, as Defendant~~s~~ has~~ve~~ acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or declaratory relief with respect to the Class as a whole.

~~28.~~113. **Manageability.** Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VIII. CAUSES OF ACTION

### COUNT ONE

### Violation of California False Advertising Law

### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

### (*On Behalf of the California Subclass*)

~~29.~~114. **Incorporation by reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

~~30.~~115. **California Subclass.** Plaintiff brings this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

~~31.~~116. **FAL Standard.** The False Advertising Law, codified at Business and Professions Code Section 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]"

~~32.~~117. **Challenged Representations Disseminated to Public.** Defendant~~s~~ violated Section 17500 when it~~they~~ advertised and marketed the Products through the unfair, deceptive, and

misleading representation disseminated to the public through the Products’ labeling and advertising. The Challenged Representations were deceptive because the Products do not conform to them. The Challenged Representations were material because they are likely to and did mislead reasonable consumers into purchasing the Products.

~~33.~~118. **Knowledge.** In making and disseminating the Challenged Representations alleged herein, Defendant~~s~~ knew or should have known that the Challenged Representations were untrue or misleading, and acted in violation of Section 17500.

~~34.~~119. **Intent to sell.** Defendant’s~~’~~ Challenged Representations were specifically designed to induce reasonable consumers, like Plaintiff and the California Subclass, to purchase the Products.

~~35.~~120. **Causation/Damages.** As a direct and proximate result of Defendant’s~~’~~ misconduct in violation of the FAL, Plaintiff and members of the California Subclass were harmed in the amount of the price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant’s~~’~~ misconduct to prevent ongoing and future harm that will result.

~~36.~~121. **Punitive Damages.** Defendant’s~~’~~ unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant’s~~’~~ misconduct is malicious, as Defendant’s acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendant~~s~~ willfully and knowingly disregarded the rights of Plaintiff and consumers, as Defendant wass ~~were~~ aware of the probable dangerous consequences of its~~their~~ conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendant’s~~’~~ misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate

misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's' misconduct is fraudulent as Defendants, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by Defendant's' officers, directors, and/or managing agents.

**COUNT TWO**

**Violation of California Consumers Legal Remedies Act**

**(Cal. Civ. Code § 1750, *et seq.*)**

**(*On Behalf of the California Subclass*)**

37.122. **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

38.123. **California Subclass.** Plaintiff brings this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

39.124. **CLRA Standard.** The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

40.125. **Goods/Services.** The Products are "goods," as defined by the CLRA at California Civil Code Section 1761(a).

41.126. **Defendants.** Defendant is as are "persons," as defined by the CLRA at California Civil Code Section 1761(c).

42.127. **Consumers.** Plaintiff and members of the California Subclass are "consumers," as defined by the CLRA at California Civil Code Section 1761(d).

43.128. **Transactions.** The purchases of the Products by Plaintiff and members of the California Subclass are "transactions," as defined by the CLRA under California Civil Code Section 1761(e).

~~44.~~129. **Violations of the CLRA.** Defendant~~s~~ violated the following sections of the CLRA by selling the Products to Plaintiff and the California Subclass through the misleading, deceptive, and fraudulent Challenged Representations:

1. Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have."
2. Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . [when] they are of another."
3. Section 1770(a)(9) by advertising the Products "with [the] intent not to sell them as advertised."; *and*
4. Section 1770(a)(16) by representing that the Products have "been supplied in accordance with a previous representation" when they have not.

~~45.~~130. **Knowledge.** Defendant's~~'~~ use of the Challenged Representations on the Products was likely to deceive, and Defendant~~s~~ knew or should have known that these representations were misleading.

~~46.~~131. **Malicious.** Defendant's~~'~~ conduct is malicious, fraudulent, and wanton in that Defendant~~s~~ intentionally misled consumers, including Plaintiff, to increase the sales of the Products.

~~47.~~132. **Plaintiff Could Not Have Avoided Injury.** Plaintiff and members of the California Subclass could not have reasonably avoided such injury. Plaintiff and members of the California Subclass were misled and unaware of the existence of facts that Defendant~~s~~ suppressed and failed to disclose, and Plaintiff and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

~~48.~~133. **Causation/Reliance/Materiality.** Plaintiff and the California Subclass suffered harm as a result of Defendant's~~'~~ violations of the CLRA because they relied on the Challenged Representations in deciding to purchase the Products. The Challenged Representations were together a substantial factor.

~~49.~~134. **Section 1782(d).** Pursuant to California Civil Code, Section 1782, Plaintiff's counsel, acting on behalf of all members of the Class, concurrent with the filing of this Complaint mailed a demand letter, via U.S. Certified Mail, return receipt requested, addressed to Defendant~~s~~ at their shared headquarters and principal place of business registered with the Florida Department of State (1 North Clematis Street, Suite 200, West Palm Beach, FL 33401) as well as to Defendant's~~'~~ shared registered agent for service of process (Corporate Creations Network, Inc., 801 U.S. Highway 1, North Palm Beach, FL 33408).

~~50.~~135. **Causation.** As a direct and proximate result of Defendant's~~'~~ misconduct in violation of the CLRA, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products, causing Plaintiff and members of the Class to suffer and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies.

~~51.~~136. **Injunction.** Given that Defendant's~~'~~ conduct violated California Civil Code Section 1780, Plaintiff and members of the California Subclass are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendant's~~'~~ violations of the CLRA and to dispel the public misperception generated, facilitated, and fostered by Defendant's~~'~~ false advertising campaign. Plaintiff has no adequate remedy at law. Without equitable relief, Defendant's~~'~~ unfair and deceptive practices will continue to harm Plaintiff and the California Subclass. Accordingly, Plaintiff seeks an injunction to enjoin Defendant~~s~~ from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to Section 1780(a)(2), and otherwise require Defendant~~s~~ to take corrective action necessary to dispel the public misperception engendered, fostered, and facilitated through Defendant's~~'~~ deceptive labeling of the Products with the Challenged Representations.

~~52.~~137. **Damages.** Defendant~~s~~ through its~~their~~ unlawful methods, acts, or practices described herein have caused damage to Plaintiff and other similarly situated consumers. Through a letter dated March 5, 2025 and served on Defendants (via their registered agent) through U.S. Certified Mail delivered on March 10, 2025, Plaintiff and members of the putative California Subclass provided Defendant~~s~~ with notice that they intended to seek CLRA damages pursuant to

California Civil Code Sections 1781 and 1782. More than 30 days have now elapsed since Defendant~~s~~ received notice, and Defendant hass ~~have~~ not made appropriate corrections, repairs, replacements, or other remedies, nor has it~~have they~~ agreed to execute same within a reasonable time. Plaintiff accordingly seeks CLRA damages in an amount to be proven at trial.

**COUNT THREE**

**Violation of California Unfair Competition Law**

**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

**(*On Behalf of the California Subclass*)**

~~53.~~138. **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

~~54.~~139. **California Subclass.** This cause of action is brought pursuant to Business and Professions Code Section 17200, *et seq*., on behalf of Plaintiff and a California Subclass who purchased the Products within the applicable statute of limitations.

~~55.~~140. 126. **The UCL.** California Business & Professions Code, Section 17200, *et seq.* (the **"UCL"**), prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

~~56.~~141. **False Advertising Claims.** Defendants, in their advertising of the Products, made misleading statements regarding the quality and characteristics of the Products—specifically, the Challenged Representations. Such claims appear on the labels of the Products, which are sold at retail stores and point-of-purchase displays.

~~57.~~142. **Defendant's~~'~~ Deliberately Fraudulent Marketing Scheme.** Defendant~~s~~ does not have any reasonable basis for the claims about the Products made on Florida Crystals' labeling and in Florida Crystals' advertising. Defendant~~s~~ knew and knows that its~~the~~ farming operations referenced in the Products' Challenged Representations ~~and the practices involved in their creation~~ do ~~are~~ not on the whole help save~~beneficial to~~ the planet, help~~ing~~ fight climate change, or help~~ing~~ build healthy soils because Defendant's companywide~~the Products derive from~~ farming practices

that in fact *contribute* to climate change, create local air and water pollution, and harm local soils. Defendants intentionally advertised and marketed the Products with the Challenged Representations to deceive reasonable consumers.

58.143. **Misleading Advertising Claims Cause Purchase of Products.** Defendant's' labeling and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiff, believing that purchasing the Products supports farming operations thatthe Products and the farms they derive from help save the planet, fight climate change, and build healthy soils—and thus are preferable to competing sugar products that do not claim to possess such qualities.

59.144. **Injury in Fact.** Plaintiff and the California Subclass have suffered injury in fact and have lost money or property as a result of and in reliance upon the Challenged Representations—namely, Plaintiff and the California Subclass lost the purchase price for the Products they bought from Defendants.

60.145. **Conduct Violates the UCL.** Defendant'ss' conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendant's' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

61.146. **No Reasonably Available Alternatives/Legitimate Business Interests.** Defendants failed to avail themselves of reasonably available, lawful alternatives to further their legitimate business interests.

~~62.~~147. **Business Practice.** All of the conduct alleged herein occurred and continues to occur in Defendant's~~'~~ ~~closely intertwined~~ businesses~~es~~. Defendant's~~'~~ wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendant~~s~~ voluntarily alters its ~~their~~ conduct or Defendant iss ~~are~~ otherwise ordered to do so.

~~63.~~148. **Injunction.** Pursuant to Business and Professions Code Sections 17203 and 17535, Plaintiff and the members of the California Subclass seek an order of this Court enjoining Defendant~~s~~ from continuing to engage, use, or employ its~~their~~ practice of labeling and advertising the Products with the Challenged Representations.

~~64.~~149. **Causation/Damages.** As a direct and proximate result of Defendant's~~'~~ misconduct in violation of the UCL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the UCL in restitution and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant's~~'~~ misconduct to prevent ongoing and future harm that will result.

***"Unfair" Prong***

~~65.~~150. **Unfair Standard.** Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California,* 142 Cal. App. 4th 1394, 1403 (2006).

~~66.~~151. **Injury.** Defendant's~~'~~ action of mislabeling the Products with the Challenged Representations does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, receive Products of lesser standards than what they reasonably expected to receive, instead being induced to purchase Products that harm the environment rather than help it.

Consumers cannot avoid any of the injuries caused by Defendant’s~~’~~ deceptive labeling and advertising of the Products. Accordingly, the injuries caused by Defendant’s~~’~~ deceptive labeling and advertising outweigh any benefits.

~~67.~~152. **Balancing Test.** Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They “weigh the utility of the defendant’s conduct against the gravity of the harm to the alleged victim.” *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012).

~~68.~~153. **No Utility.** Here, Defendant’s~~’~~ conduct of labeling the Products with the Challenged Representations misleading consumers into believing that purchasing the Products would convey ~~when the Products~~ general environmental benefits (through the purchases’ support of Defendant’s farming operations) ~~and the practices used to create them in fact~~ when Defendant’s farming practices actually harmed the environment and soil and accelerated climate change has no utility and financially harms purchasers. Thus, the utility of Defendant’s~~’~~ conduct is vastly outweighed by the gravity of harm.

~~69.~~154. **Legislative Declared Policy.** Some courts require that “unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition.” *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 735 (9th Cir. 2007).

~~70.~~155. **Unfair Conduct.** Defendant’s~~’~~ labeling and advertising of the Products, as alleged herein, is deceptive, misleading, and unreasonable, and constitute unfair conduct. Defendant~~s~~ knew or should have known of its~~their~~ unfair conduct. Defendant’s~~’~~ Challenged Representations constitute an unfair business practice within the meaning of California Business and Professions Code Section 17200.

~~71.~~156. **Reasonably Available Alternatives.** There existed reasonably available alternatives to further Defendant’s~~’~~ legitimate business interests, other than the conduct described herein. For example, Defendant~~s~~ could have refrained from labeling the Products with the Challenged Representations *or* acted to ensure that Defendant’s farming ~~the Products~~ did~~were~~, indeed, benefit~~cial to~~ the planet and help~~ed~~ fight climate change and build healthy soils.

72.157. **Defendant's' Wrongful Conduct.** All of the conduct alleged herein occurs and continues to occur in Defendant's' business. Defendant's' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

73.158. **Injunction.** Pursuant to Business and Professions Code Section 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendant's from continuing to engage, use, or employ itstheir practices of labeling the Products with the Challenged Representations.

74.159. **Causation/Damages.** Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's' unfair conduct. Plaintiff and the California Subclass paid an unwarranted premium for these Products. Specifically, Plaintiff and the California Subclass paid for Products whose purchase they were reasonably led to believe would support a company working to save the planet, fight climate change, and build healthy soils through its substantial farming operations.that are beneficial to the planet and produced and sold by a company whose farming helps fight climate change and build healthy soils. Plaintiff and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiff seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

***"Fraudulent" Prong***

75.160. **Fraud Standard.** The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

76.161. **Fraudulent and Material Challenged Representations.** Defendants used the Challenged Representations with the intent to sell the Products to consumers, including Plaintiff and the California Subclass. The Challenged Representations are deceptive, and Defendants knew, or should have known, of their deception. The Challenged Representations are likely to mislead consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

77.162. **Fraudulent Business Practice.** As alleged herein, the labeling and advertising by Defendants constitutes a fraudulent business practice in violation of California Business & Professions Code Section 17200.

78.163. **Reasonable and Detrimental Reliance.** Plaintiff and the California Subclass reasonably and detrimentally relied on the Challenged Representations to their detriment in that they purchased the Products.

79.164. **Reasonably Available Alternatives.** Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representations.

80.165. **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendant's' business. Defendant's' wrongful conduct is part of a pattern or generalized course of conduct.

81.166. **Injunction.** Pursuant to Business and Professions Code Section 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of labeling the Products with the Challenged Representations.

82.167. **Causation/Damages.** Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's' fraudulent conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Products. Specifically, Plaintiff and the California Subclass paid a premium (or at all) for Products Defendant misrepresented through the Challenged Representations as helping save the planet, fight climate change, and build healthy soilthat are beneficial to the planet and produced through farming that helps fight climate change and build healthy soils, when in fact purchasing the Products does not benefitare not beneficial to the planet, asand Defendant's' farming practices *harm* the natural environment, *contribute* to climate change, and *degrade* the vast majority of Defendant's EAA Glades soils due to Defendant's decision to engage in burn-harvesting. Plaintiff and the California Subclass would not have purchased the Products if they had known the truth. Accordingly, Plaintiff seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

***"Unlawful" Prong***

83.168. **Unlawful Standard.** The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

84.169. **Violations of FAL and CLRA.** Defendant's' labeling of the Products, as alleged herein, violates California Business and Professions Code Section 17500, *et seq.* (the "**FAL**") and violates California Civil Code Section 1750, *et seq.* (the "**CLRA**"), as set forth above in the sections regarding those causes of action.

85.170. **Fraud.** Additionally, Defendant's' use of the Challenged Representations to sell the Products violates California Civil Code Sections 1572 (actual fraud), 1573 (constructive fraud), 1709-1710 (fraudulent deceit), and 1711 (deceit upon the public), as set forth in the facts alleged above.

86.171. **Additional Violations.** Defendant's' conduct in making the false representations described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code Sections 17200 through 17208.

87.172. **Unlawful Conduct.** Defendant's' labeling and advertising of the Products, as alleged herein, is deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendants knew or should have known of itstheir unlawful conduct.

88.173. **Reasonably Available Alternatives.** Defendants had reasonably available alternatives to further itstheir legitimate business interests other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representations.

89.174. **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendants; closely intertwined businesses. Defendant's' wrongful conduct is part of a pattern or generalized course of conduct.

~~90.~~175. **Injunction.** Pursuant to Business and Professions Code Section 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendant~~s~~ from continuing to engage, use, or employ its practice of deceptive advertising of the Products.

~~91.~~176. **Causation/Damages.** Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's~~'~~ unlawful conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Products. Plaintiff and the California Subclass would not have purchased the Products if they had known that Defendant~~s~~ purposely deceived consumers into believing that purchasing the Products benefitted~~were beneficial to~~ the planet, ~~and produced through farming that~~ helpeds fight climate change, and helped ~~and~~ build healthy soils when Defendant's farming operations~~their production~~ actually *harm~~s~~* the planet~~—,~~ globally and locally~~—,~~ contribute~~s~~ to climate change, and degrade~~s~~ Glades soils as compared to the readily available alternative of green harvesting. Accordingly, Plaintiff seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

## COUNT FOUR

### Breach of Warranty

**(*On Behalf of the Nationwide Class and California Subclass*)**

~~92.~~177. **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

~~93.~~178. **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass, members of which purchased the Products within the applicable statute of limitations.

~~94.~~179. **Express Warranty.** By advertising and selling the Products at issue, Defendant~~s~~ made promises and affirmations of fact on the Products' labeling as well as through their marketing and advertising, as described herein. This labeling and advertising constitute express warranties and became part of the basis of the bargain between Plaintiff and members of the Class and Defendant~~s~~. Defendant~~s~~ purports, through the Products' labeling and advertising, to create express warranties that the Products, among other things, conform to the Challenged Representations.

~~95.~~180. **Implied Warranty of Merchantability.** By advertising and selling the Products at issue, Defendant~~s~~, a merchant~~s~~ of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' labeling and through their marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitutes warranties that became part of the basis of the bargain between Plaintiff and members of the Class and Defendant~~s~~—to wit, that the Products, among other things, conform to the Challenged Representations.

~~96.~~181. **Breach of Warranty.** Contrary to Defendant's~~'~~ warranties, the Products do not conform to the Challenged Representations and, therefore, Defendant~~s~~ breached its warranties about the Products and their qualities.

~~97.~~182. **Causation/Remedies.** As a direct and proximate result of Defendant's~~'~~ breach of warranty, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant's~~'~~ misconduct to prevent ongoing and future harm that will result.

~~98.~~183. **Punitive Damages.** Plaintiff seeks punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiff and the Class. Defendant's~~'~~ unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's~~'~~ misconduct is malicious, as Defendant~~s~~ acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendant~~s~~ willfully and knowingly disregarded the rights of Plaintiff and consumers, as Defendant~~s~~ was~~ere~~ aware of the probable dangerous consequences of

itstheir conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendant's' misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such misconduct. This misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's' misconduct is fraudulent as Defendants, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants.

**COUNT FIVE**

**Unjust Enrichment/Restitution**

**(*On Behalf of the Nationwide Class and California Subclass*)**

99.184. **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

100.185. **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass (the Class) who purchased the Products within the applicable statute of limitations.

101.186. **Plaintiff/Class Conferred a Benefit.** By purchasing the Products, Plaintiff and members of the Class conferred a benefit on Defendants in the form of the purchase price of the Products.

102.187. **Defendant's' Knowledge of Conferred Benefit.** Defendants had knowledge of such benefit, and Defendants appreciated the benefit because, were consumers not to purchase the Products, Defendants would not generate revenue from the sales of the Products.

103.188. **Defendant's' Unjust Receipt Through Deception.** Defendant's' knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's' fraudulent, misleading, and deceptive labeling and advertising.

~~104.~~189. **Causation/Damages.** As a direct and proximate result of Defendant’s~~’~~ unjust enrichment, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant’s~~’~~ misconduct to prevent ongoing and future harm that will result.

~~105.~~190. **Punitive Damages**. Plaintiff seeks punitive damages pursuant to this cause of action for unjust enrichment on behalf of Plaintiff and the Class. Defendant’s~~’~~ unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant’s~~’~~ misconduct is malicious, as Defendant~~s~~ acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendant~~s~~ willfully and knowingly disregarded the rights of Plaintiff and consumers, as Defendant~~s~~ was~~ere~~ aware of the probable dangerous consequences of its~~their~~ conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendant’s~~’~~ misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. This misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant’s~~’~~ misconduct is fraudulent as Defendant~~s~~, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant~~s~~.

## VIII. PRAYER FOR RELIEF

~~106.~~191. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment and relief against Defendant~~s~~ as follows:

**(1) Class Certification:** For an order certifying this action as a class action, appointing Plaintiff as the Class Representative, and appointing Plaintiff's counsel as class counsel;

**(2) Payment of Notice Costs:** For an order directing Defendant~~s~~ to pay to notify Class Members of the pendency of this suit;

**(3) Declaratory Relief:** For an order declaring that Defendant's~~'~~ conduct violates the statutes and laws referenced herein consistent with applicable law and pursuant to only those causes of action so permitted;

**(4) Injunctive Relief:** For public injunctive relief prohibiting Defendant~~s~~, ~~their~~ its officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, whether acting directly or indirectly, from continuing to conduct business through the unlawful and unfair practices alleged herein (including, for example, an order that Defendant~~s~~ immediately cease and desist from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein); requiring Defendant~~s~~ to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendant's~~'~~ unlawful conduct; and requiring Defendant~~s~~ to take all further and just corrective action, consistent with applicable law and pursuant to only those causes of action so permitted;

**(5) Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiff and the Class, consistent with applicable law and pursuant to only those causes of action so permitted;

**(6) Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with applicable law and pursuant to only those causes of action so permitted, including punitive damages against the individual

officers, directors, and/or managing agents of Defendants pursuant to California Civil Code Section 3294;

**(7)** **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with applicable law and pursuant to only those causes of action so permitted;

**(8)** **Pre- & Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with applicable law and pursuant to only those causes of action so permitted; *and*

**(9)** **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues and causes of action so triable.

Dated: January 9, 2026

Respectfully submitted,

*/s/ Ben Fuchs*
Benjamin J. Fuchs, Esq.
**LAW OFFICE OF BENJAMIN J. FUCHS**

Chris Nidel, Esq. (*Pro Hac Vice Forthcoming*)
April Strauss, Esq.
**NIDEL & NACE, P.L.L.C.**

*Attorneys for Plaintiff*